No. 00-744

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 207

IN RE THE MARRIAGE OF

JILL D. ROBISON,

        Petitioner and Appellant,

    and

DIXON L. ROBISON,

        Respondent and Respondent.


APPEAL FROM:    District Court of the Second Judicial District,
                In and for the County of Silver Bow,
                The Honorable James E. Purcell, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

                Mark P. Yeshe, Attorney at Law, Helena, Montana

        For Respondent:

                C. Kathleen McBride, Corette, Pohlman & Kebe, Butte, Montana


Submitted on Briefs: April 19, 2001

Decided: September 10, 2002

Filed:

_____
                         Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Jill D. Robison (Jill) appeals an order of the District Court for the Second Judicial District, Silver Bow County, granting Dixon L. Robison's (Dixon's) motion to amend the parties' parenting plan to provide that the children will reside with Dixon in Butte if Jill moves outside the Butte vicinity. We affirm.

¶2    Jill raises the following issues on appeal:

¶3    1. Whether the District Court's order violated Jill's constitutional right to travel.

¶4    2. Whether the District Court abused its discretion in amending the parties' parenting plan.

**Factual and Procedural Background**

¶5    Jill and Dixon married in 1982. They have three children: Ashlee, born August 24, 1985; Lauren, born December 2, 1992; and Tanner, born October 6, 1995. The family moved to Butte in 1994. Both Jill and Dixon are doctors. Dixon is a dermatologist and has his own practice in Butte. Jill is a pediatrician and has practiced with other physicians on a part-time basis while living in Butte.

¶6    Jill and Dixon divorced in March 1999. Prior to their divorce, the parties' entered into a Final Parenting Plan and a Property Settlement Agreement which allowed Jill to remain in the family home. The parenting plan provided that the children were to reside with Jill, but that Dixon was to have two overnights with the children per week. In addition, the parenting plan provided that holidays were to be shared and summers split in whatever way maximized each parent's free time with the children.

2

¶7     In the spring of 2000, Jill informed Dixon that she planned to move to Kamiah, Idaho with the children. As a result, Dixon filed with the District Court his Motion to Amend the Parenting Plan. On May 18, 2000, the District Court issued an order preventing Jill from removing the children from Montana without Dixon's consent or an order of the court.

¶8     Jill and Dixon reached a stipulation on June 5, 2000, that provided for their sharing time with the children during that summer. The stipulation also named Dr. Diane Zuniga, a psychiatrist, as the court's expert. On June 30, 2000, Jill provided Dixon with her Notice of Intent to Move. The notice advised that Jill intended to move to Idaho on or after August 15, 2000. The notice also stated that Jill intended to remarry shortly after the move and that she intended to forego employment and remain at home until Tanner entered kindergarten. As a result of Jill's notice, Dixon filed a renewed motion to amend the parenting plan on July 28, 2000.

¶9     The District Court conducted a hearing in this matter on July 31, 2000. While Dr. Zuniga did not testify at the hearing, the report she prepared following several interviews with the family, both as a group and with each family member individually, was admitted into evidence. In her report, Dr. Zuniga stated that the children love and need both parents, and that both Jill and Dixon strongly agree that the children need to have regular contact with and the support of the other parent. Dr. Zuniga also noted that Dixon's parents live in Butte and they have been involved in the care of the children, especially Tanner. Dr. Zuniga recommended shared or joint custody and that the children remain together and not be separated. She also stated that the ideal situation would "require Jill to remain in close

3

proximity to the father's home or place of work in order for the shared custody arrangements to work."

¶10 Dixon testified at the hearing that his biggest concern about Jill moving the children to Idaho was that he would be less involved and less of a parental influence. He also testified that if Jill remained in Butte, he wanted to revise the parenting plan so that the children would spend every other week with him, and, if Jill moved to Idaho, he wanted the children to reside with him in Butte.

¶11 Jill testified that she is moving to Idaho, not only because her fiancé lives there, but because the schools are superior and she has an employment opportunity there. She would be a consulting pediatrician and would work her own hours, make more money, and not be on call.

¶12 On August 15, 2000, the District Court entered its Findings of Fact, Conclusions of Law and Order wherein the court adopted Dr. Zuniga's recommendations and concluded that the children's best interests were served by their remaining in Butte. The court ordered that Jill's residence would be considered the children's primary residence if Jill remained in Butte. However, the parenting plan would change to alternating weeks with each parent. The court further concluded that if Jill moved to Idaho, the children would remain in Butte with Dixon.

¶13 On September 7, 2000, Dixon filed a Motion for Contempt and Motion for Enforcement of Parenting Plan as Amended. In his motion, Dixon contended that Jill took the children to Idaho on August 27, 2000, in contravention of the District Court's August 15, 2000 order and refused to return them to Butte. Consequently, Dixon was forced to travel to

4

Idaho to pick up the two youngest children and bring them back to Butte. The oldest child, Ashlee, refused to return to Butte.

¶14    On September 19, 2000, the District Court found Jill in contempt for not returning Ashlee to Butte to reside with her father. Thereafter, in November 2000, Jill and Dixon entered into a Stipulation and Agreement Between Parties to amend the District Court's August 15, 2000 Findings of Fact, Conclusions of Law and Order as they related to the transportation of the children. In the stipulation, the parties tacitly recognized Ashlee's desire to live in Idaho. The District Court "approved and ratified" the stipulation on December 11, 2000, pending the decision of this Court as to Jill's appeal of the District Court's August 15, 2000 order granting Dixon's motions to amend the parenting plan.

**Standard of Review**

¶15    We review a district court's findings regarding custody to determine whether those findings are clearly erroneous. *Pankratz v. Teske*, 2002 MT 112, ¶ 8, 309 Mont. 499, ¶ 8, 48 P.3d 30, ¶ 8 (citing *In re Custody of Arneson-Nelson*, 2001 MT 242, ¶ 15, 307 Mont. 60, ¶ 15, 36 P.3d 874, ¶ 15). Findings are clearly erroneous if they are not supported by substantial evidence, the court misapprehends the effect of the evidence, or this Court's review of the record convinces it that a mistake has been made. *Pankratz*, ¶ 8. We will reverse a district court's decision relating to custody only where an abuse of discretion is clearly demonstrated. *Pankratz*, ¶ 8. *See also In re Marriage of McKenna*, 2000 MT 58, ¶ 14, 299 Mont. 13, ¶ 14, 996 P.2d 386, ¶ 14; *In re Marriage of Baer*, 1998 MT 29, ¶ 18, 287 Mont. 322, ¶ 18, 954 P.2d 1125, ¶ 18. The test for an abuse of discretion is whether the

5

district court acted arbitrarily without the employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. *In re Marriage of Meeks* (1996), 276 Mont. 237, 242, 915 P.2d 831, 834. Our review as to questions of law is plenary. *In re Custody of D.M.G.*, 1998 MT 1, ¶ 10, 287 Mont. 120, ¶ 10, 951 P.2d 1377, ¶ 10 (citing *In re Marriage of Syverson* (1997), 281 Mont. 1, 15-16, 931 P.2d 691, 700).

## Issue 1.

¶16 *Whether the District Court's order violated Jill's constitutional right to travel.*

¶17 Jill argues on appeal that she has a constitutional right to relocate with the children and that that right can be abridged only on the basis of a substantial showing of a compelling state interest. Jill further argues that Dixon had the heavy burden of showing that the children would be adversely affected by a move to Idaho and that Dixon did not meet that burden. Consequently, Jill maintains that she could not be restricted from moving merely because it might be best for the children if both parents lived in the same town.

¶18 Dixon argues, on the other hand, that Jill's right to travel "does not trump the best interest[s] of the children." Hence, Dixon contends that the District Court did not violate Jill's right to travel as Dixon provided legally sufficient proof that the best interests of the children would be most appropriately served by their remaining in Butte.

¶19 In support of her arguments, Jill relies on our prior decisions in *In re Marriage of Cole* (1986), 224 Mont. 207, 729 P.2d 1276, and *In re Custody of D.M.G.*, 1998 MT 1, 287 Mont. 120, 951 P.2d 1377. In *Cole*, the parties, Marilyn and James, divorced after twelve years of marriage. In its decree of dissolution, the District Court awarded the parties joint custody of

6

their two minor boys, one of whom had Down's Syndrome manifested by learning and physical disabilities. Marilyn was to be the custodial parent for the nine and a half months of the school year and James was to be the custodial parent for two and a half months during the summer. When Marilyn expressed a desire to move to Tampa, Florida because of the advanced employment opportunities available in the Tampa area, James sought a court order restricting her from moving outside the State of Montana with the children. However, the District Court refused to place a travel restriction upon Marilyn during the time in which she had custody of the children. *Cole*, 224 Mont. at 209, 729 P.2d at 1278.

¶20 On appeal, we determined in *Cole*, that courts must balance the custodial parent's fundamental right to travel with the best interests of the child. To that end, we noted the following:

> As a fundamental right, the right to travel interstate can only be restricted in support of a compelling state interest. We believe that furtherance of the best interests of a child, by assuring the maximum opportunities for the love, guidance and support of both natural parents, may constitute a compelling state interest worthy of reasonable interference with the right to travel interstate. We caution, however, that any interference with this fundamental right must be made cautiously, and may only be made in furtherance of the best interests of the child. To that end, we require the parent requesting the travel restriction to provide sufficient proof that a restriction is, in fact, in the best interests of the child.

*Cole*, 224 Mont. at 213, 729 P.2d at 1280-81 (internal citations omitted).

¶21 Thus, Jill contends that *Cole* requires that more than a mere best interest showing must be made. *Cole* is distinguishable from the case *sub judice*, however, because *Cole* was based partly on the presumption that custody should be granted to the parent who provided most of

7

the primary care during the child's life. That idea was codified in 1995 at § 40-4-212(3)(a), MCA, however, language to that effect was subsequently deleted from § 40-4-212, MCA, by the 1997 Legislature. Hence, a presumption in favor of the parent providing primary care of the child, no longer exists.

¶22 Furthermore, unlike the case before us on appeal, considerable testimony by counselors, teachers, the family doctor and two court appointed investigators led the Court in *Cole* to conclude that Marilyn continue as the primary custodial parent and that it was in the best interests of the child with Down's Syndrome to maintain one residence during the school year. *Cole*, 224 Mont. at 211-12, 729 P.2d at 1279. Moreover, the Court found, based on testimony from one of the children's counselors, that Tampa was likely to provide a more complete line of services for handicapped children than was available in Montana. *Cole*, 224 Mont. at 212, 729 P.2d at 1289.

¶23 Similarly, *D.M.G.*, the other case cited by Jill, is also distinguishable from the case *sub judice*. In *D.M.G.*, Tammy, the children's mother, relocated to Salem, Oregon with her two minor children because of the availability of better job opportunities and the nearness of family in Salem. The children's father, Michael, did not try to stop Tammy from moving the children to Salem. However, a few months after the move, Michael filed a petition for custody and visitation. By that time, Tammy was permanently employed as a shipping clerk. She was self-supporting and her employment included medical, dental and retirement benefits. Tammy and the children lived in their own home and Tammy's mother, who also lived in Salem, assisted Tammy with the children in the mornings before they went to pre-

8

school and day care. *D.M.G.*, 287 Mont. at 122-23, 951 P.2d at 1379.

¶24 The District Court awarded the parties joint custody of their children and provided that, in the event Tammy returns to the Helena area, she is to have primary physical custody of the children. However, if the parties continue to live in separate states, primary physical custody would be alternated between the parties on a two-year basis. *D.M.G.*, 287 Mont. at 122, 951 P.2d at 1379. On appeal, this Court reversed, holding that the District Court abused its discretion in effectively requiring Tammy to relocate or lose custody in the absence of sufficient proof of a compelling nature to interfere with her constitutional right to travel. *D.M.G.*, 287 Mont. at 132-33, 951 P.2d at 1385.

¶25 While we conclude that the basic constitutional principals in *D.M.G.*--the fundamental nature of the right to travel and the need to demonstrate a compelling interest before violating that right--are still viable, we note that the facts in the present case are distinguishable from *D.M.G.*.

¶26 In *D.M.G.*, prior to her move to Salem, Tammy received assistance from AFDC. She began working and took courses to better herself. In Salem, Tammy was able to find better employment and provide a home and benefits for the children. In the case *sub judice*, Jill is not being required to relocate after moving and making a better life for herself. The record establishes that Jill is not moving to build her career. Rather, she has chosen to move to an area unfamiliar to her or to the children and that Jill has chosen not to work. Jill is quitting her job as a pediatrician which paid her more than $100,000 per year to move to a town with no hospital. Neither does Jill or her fiancé, whom she intends to live with after she moves to

9

Idaho, have any family in Kamiah.

¶27    Furthermore, *D.M.G.* was based on a statute that has now been repealed by the Montana Legislature.  That statute, § 40-6-231, MCA (repealed Sec. 39, Ch. 343, L. 1997), provided that a parent entitled to the custody of a child had the right to change his or her residence "subject to the power of the proper court to restrain a removal which would prejudice the rights or welfare of the child."  In its place, the Legislature amended §§ 40-4-217 and 219, MCA.  Those statutes now provide in pertinent part:

> (1) A parent who intends to change residence shall, unless precluded under 40-4-234, provide written notice to the other parent.
> (2) If a parent's change in residence will significantly affect the child's contact with the other parent, notice must be served personally or given by certified mail not less than 30 days before the proposed change in residence and must include a proposed revised residential schedule. Proof of service must be filed with the court that adopted the parenting plan. Failure of the parent who receives notice to respond to the written notice or to seek amendment of the residential schedule pursuant to 40-4-219 within the 30-day period constitutes acceptance of the proposed revised residential schedule.

Section 40-4-217, MCA.

> (1) The court may in its discretion amend a prior parenting plan if it finds, upon the basis of facts that have arisen since the prior plan or that were unknown to the court at the time of entry of the prior plan, that a change has occurred in the circumstances of the child *and that the amendment is necessary to serve the best interest of the child*. In determining the child's best interest under this section, the court may, in addition to the criteria in 40-4-212, also consider whether:
>     . . . .
> (e) one parent has changed or intends to change the child's residence in a manner that significantly affects the child's contact with the other parent.

Section 40-4-219, MCA (emphasis added).  Thus, contrary to Jill's assertion that the parent resisting the move must show that the move would be disadvantageous for the child or that

10

the child would be harmed by the move, the burden of proof is still the best interests of the child standard.

¶28 When determining the best interests of a child, the court must consider relevant parenting factors including, but not limited to, the criteria in § 40-4-212, MCA. These criteria include the wishes of the child's parent or parents; the wishes of the child; the interaction and interrelationship of the child with the child's parent or parents and siblings and with any other person who significantly affects the child's best interests; the child's adjustment to home, school and community; and continuity and stability of care.

¶29 In this case, the District Court found that Dixon has a well established support system for the children in the community including Dixon's parents who have a close relationship with the parties' three children, as well as neighbors, friends with children of similar ages, day care providers and teachers. Jill, on the other hand, has no relatives in Idaho, nor does her fiancé. The District Court's determination reflects the criteria in § 40-4-212, MCA, specifically subsections (1)(c) and (d) regarding the children's interactions with family members and other individuals, and the children's adjustment to home, school and community. Jill has not established that the District Court's findings are clearly erroneous.

¶30 Accordingly, we hold that the District Court was correct in concluding that the best interests of the children outweighed Jill's fundamental right to travel.

**Issue 2.**

¶31 *Whether the District Court abused its discretion in amending the parties' parenting plan.*

11

¶32 In its August 15, 2000 order, the District Court amended the parenting plan to provide that, if Jill remained in Butte, her residence would be considered the children's primary residence, however, the children would spend alternating weeks with each parent rather than the current arrangement of two nights each week with their father. The court reasoned that this would decrease the amount of communication necessary to juggle "the almost daily changing schedule."

¶33 Jill argues on appeal that the District Court abused its discretion in changing the parenting plan to alternating weeks with each parent as there was no evidence to show that such a modification served the children's best interests. She claims that the only evidence in support of this plan was Dixon's testimony that that is what he would prefer. Jill maintains that while Dr. Zuniga recommended that Jill remain the primary parent, nowhere in Dr. Zuniga's report did she recommend that the children spend every other week with their father. Thus, Jill contends that the court's findings were clearly erroneous and should be revised.

¶34 As we noted in our discussion in the previous issue, § 40-4-219(1), MCA, provides that a parenting plan may be amended if a change has occurred in the circumstances of the child and the amendment is necessary to serve the best interests of the child. In this case, evidence was presented and the District Court found that between overnights, dinner, evenings and additional days with the children, Dixon had had significant contact with the children on 238 days in the 1999 calendar year and that through May of the 2000 calendar year he had had significant contact with the children on 92 days. Moreover, since school let out in June 2000 through the date of the July 31, 2000 hearing, the children had been with

12

Dixon a majority of the time. Thus, the District Court's amendment of the final parenting plan to alternating weeks reflects the reality of the parties' actual parenting arrangement since their divorce and would provide for continuity and stability of care as contemplated by § 40-4-212(1)(h), MCA.

¶35 There was also testimony that Dixon and Jill had difficulty communicating at times following the divorce which led to miscommunications and situations which upset the children. Dixon testified that the more structured and predictable schedule of alternating weeks would serve to eliminate communication problems between the parties and would alleviate the unpredictability which in the past had caused the children considerable anxiety. Dixon noted in his brief on appeal, and we agree, that amending the parenting plan to reflect a situation in which the children have flourished, while eliminating the tension and confusion of constant schedule changes between the parents can only be in the children's best interests.

¶36 Accordingly, we hold that the District Court did not abuse its discretion in amending the parties' parenting plan to allow for alternating weeks with each parent if Jill continued to reside in Butte.

¶37 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ TERRY N. TRIEWEILER

13

/S/ JIM REGNIER
/S/ JIM RICE