No. DA 06-0437

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 178

_____

STOP OVER SPENDING MONTANA, a political committee;
TREVIS BUTCHER, individually and as Political Committee Treasurer;
SCOTT MENDENHALL, individually and as Political Committee Chairman,

        Plaintiffs and Respondents,

   v.

STATE OF MONTANA, by and through MIKE McGRATH, in his capacity
as the Attorney General; and BRAD JOHNSON, in his capacity as Secretary of State,

        Defendants and Appellants.

_____

APPEAL FROM:    District Court of the First Judicial District,
                In and for the County of Lewis and Clark, Cause No. ADV-2006-168
                The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

        For Appellants:

                Hon. Mike McGrath, Attorney General; Anthony Johnstone and Pam D.
                Bucy, Assistant Attorneys General, Helena, Montana

        For Respondents:

                Chris J. Gallus, Attorney at Law, Helena, Montana

        For Amicus:

                Elizabeth L. Griffing, Attorney at Law, Missoula, Montana;
                James P. Reynolds and David K. W. Wilson, Jr., Reynolds, Motl &
                Sherwood, P.L.L.P., Helena, Montana (for "Not in Montana: Citizens
                Against CI-97")

                           _____
                           Submitted on Briefs:  July 19, 2006
                                Decided:  August 7, 2006

Filed:

        _____
                Clerk

Justice John Warner delivered the Opinion of the Court.

¶1     A committee called Stop Overspending Montana (Proponents) petitioned for the adoption of Constitutional Initiative No. 97. The basic effect of the initiative is to amend Article VIII, Section 9 of the Montana Constitution to include an additional limit on appropriations by the Legislature to an amount that is determined by applying a formula based on the growth rate of the population and inflation unless the increase is approved by the electorate.

¶2     The material facts in this litigation are not disputed. Proponents' petition to place CI-97 on the ballot was approved by the Secretary of State, as required by Title 13, Chapter 27, Parts 2 and 3, MCA. It then was transmitted to the Attorney General as required by § 13-27-312, MCA. The Attorney General, after approving the petition as to form, sought and obtained the advice of parties on both sides of the issue as well as unsolicited comments from others. In addition, as CI-97 has a fiscal impact, it was submitted to the budget director for preparation of a fiscal note.

¶3     In compliance with §§ 13-27-312(2)-(3), MCA, the Attorney General prepared separate statements explaining the purpose of the measure, the implications of a vote for and a vote against the measure, and a fiscal statement.

¶4     Proponents were dissatisfied with the statements prepared by the Attorney General. They timely filed a complaint in the District Court for the First Judicial District, Lewis & Clark County, requesting the Court to alter all three of the Attorney General's statements; that is, the statement explaining the purpose of the measure, the statements of the implications of a vote for and a vote against the measure, and the fiscal statement.

2

¶5 The Attorney General was served with the complaint. He did not immediately answer. Proponents did not move the District Court to expedite the court action.[1] Proponents immediately proceeded to print petitions calling for the adoption of CI-97 and started collecting signatures. The petitions which registered voters have signed contain the statements prepared by the Attorney General.

¶6 After a hearing, the District Court promptly considered the questions presented and entered its Decision and Order on June 14, 2006. The District Court determined that the statement of the purpose of CI-97 drafted by the Attorney General was not true and accurate, the statements of implication drafted by the Attorney General were not true and, likewise, the fiscal statement drafted by the Attorney General was inaccurate and, consequently, untrue. The District Court rewrote all of the statements, and ordered that its amended statements be placed on the ballot concerning CI-97, should the measure become qualified for submission to the electorate.

¶7 The District Court also rejected the Attorney General's argument that § 13-27-312, MCA, requires that the statements on the petitions that are circulated and those on the ballot be the same. As a result, it declined to invalidate the signatures already gathered on petitions which do not contain the court's revised statements.

¶8 The Attorney General appealed the District Court order. This Court ordered expedited briefing, and has advanced this case on its calendar.

¶9 The order of the District Court is reversed.

---

[1] Section 13-27-316(3)(a), MCA, provides that the district court "shall examine the proposed measure and the challenged statement . . . and shall as soon as possible render a decision[.]"

¶10    Mixed questions of law and fact are presented to this Court when the historical facts of a case are admitted or established, the applicable law is undisputed, and the issue is whether the facts satisfy the statutory standard. *State v. Warclub*, 2005 MT 149, ¶ 21, 327 Mont. 352, ¶ 21, 114 P.3d 254, ¶ 21 (citing *Lambert v. Blodgett* (9th Cir. 2004), 393 F.3d 943, 965 (citing *Pullman-Standard v. Swint* (1982), 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1790, 72 L.Ed.2d 66, 80)). The statements prepared by the Attorney General are before the Court, and there is no dispute which statutes apply. The issues in this case present mixed questions of law and fact. This Court reviews mixed questions of law and fact *de novo*. *Duffy v. State*, 2005 MT 228, ¶ 10, 328 Mont. 369, ¶ 10, 120 P.3d 398, ¶ 10.

¶11    Section 13-27-312(4), MCA, contains the requirements for drafting statements of purpose and implication:

> The statement of purpose and the statements of implication must express the true and impartial explanation of the proposed ballot issue in plain, easily understood language and may not be arguments or written so as to create prejudice for or against the measure. Statements of implication must be written so that a positive vote indicates support for the measure and a negative vote indicates opposition to the measure.

¶12    The Attorney General has been designated by the Legislature as the public official who is to prepare the statements at issue. As long as the Attorney General's explanatory statement uses ordinary plain language, explains the general purpose of the issues submitted in language that is true and impartial, and not argumentative or likely to create prejudice either for or against the issue, the requirements of the law are met. *State ex rel. Wenzel v. Murray* (1978), 178 Mont. 441, 448, 585 P.2d 633, 637. If the proponents of a ballot measure believe that the statements prepared by the Attorney General do not

4

satisfy the requirements of § 13-27-312, MCA, they may challenge the adequacy of the statements in the First Judicial District Court, Lewis & Clark County. Section 13-27-316(1), MCA.

¶13 The statement of purpose prepared by the Attorney General reads:

> The Montana Constitution currently prohibits appropriations by the legislature that exceed anticipated revenue. This measure adds a constitutional spending limit that would prohibit increases in appropriations greater than the combined growth rate of population and inflation. It allows appropriations up to the largest spending limit for any previous biennium. Emergencies, debt payments, pro-rata tax rebates, various appropriations expressly provided by the Montana Constitution, and expenditures from funding sources including the federal government, constitutionally created trusts, and certain user fees are not included in the spending limit. The legislature may exceed the spending limit only with voter approval.

¶14 The District Court did not determine that the Attorney General failed to use easily understood language in the statement of purpose or that it was written so as to create prejudice for or against the measure. The District Court determined that the Attorney General's statement is inaccurate in referring to the growth rate of population and inflation, rather than a change in those factors, as reflected in the text of the measure. It also determined the Attorney General's statement omitted salient provisions of the measure and, consequently, was not a true explanation of the measure. The District Court then rewrote the statement of purpose and certified its statement to the Secretary of State.

¶15 The District Court was incorrect when it determined that the Attorney General's statement of purpose is inaccurate in referring to the growth rate of population and inflation rather than a change in these factors. It is the purpose of the initiative to limit the ability of the Legislature to increase appropriations greater than an amount that is to

5

be determined by considering any growth in Montana's population, and also considering inflation, a factor that takes into account any increase in the costs of goods and services. The measure does not provide that the legislature must decrease appropriations in the event Montana's population decreases or deflation occurs. Thus, the statement of purpose drafted by the Attorney General is not inaccurate.

¶16 The District Court also determined that the Attorney General's statement of purpose omits "salient provisions" of the measure and, therefore, is not a true explanation of it. The District Court's rewritten statement, similar to that drafted by the Attorney General, refers to items that are not included in the limit. What the District Court added to the statement of purpose were statements that any Montana resident or business could sue to enforce the new measure, could recover costs and fees if the suit is successful, and that the new limit would apply to the next Legislature. In order to add these statements and remain within the statutorily-mandated 100-word limit, the District Court changed the first sentence of the Attorney General's statement and shortened the statement of items exempted from calculating the limit that is imposed on new appropriations.

¶17 We decline to hold, in this instance, that the statement of the Attorney General is untrue and biased because it does not say a lawsuit may be brought to enforce it, and that it will, if adopted, be binding on the next Legislature. Section 13-27-312(2)(a), MCA, requires the Attorney General, after seeking comments, to prepare a statement of the purpose of the measure containing not more than 100 words. Necessarily, a complete description of every part of the measure cannot be included. There are numerous portions of the initiative, which is lengthy and complicated, that could be deemed salient

6

to voters. They cannot all be truthfully described in 100 words. The statement of purpose prepared by the Attorney General does state the purpose of CI-97; that is, what it will do. The Attorney General's statement of purpose then briefly describes some elements of how the measure's purpose will be accomplished, if it is adopted, and closes by stating that the limit on appropriations can be exceeded if approved by the electorate. It is not for a court to add to the requirements of § 13-27-312, MCA, that to be adequate, a statement of the purpose of an initiative must include a description of how it can be enforced, or a statement of when it will become effective. *See* § 1-2-101, MCA.

¶18 By our ruling here, we do not determine that the corrections and additions ordered by the District Court are patently wrong, or even that this Court would not prefer the District Court's rendition of the statement over that of the Attorney General. Nor do we conclude that the Court or individual Justices could not do a better job of drafting a statement of purpose.[2] What we do hold is that the statement of purpose prepared by the Attorney General adequately meets the statutory obligation to provide a true and impartial explanation of the proposed ballot issue in plain, easily understood language that is not drafted so as to create prejudice for or against the measure. To foreclose the prospect of endless and subjective challenges, as long as the statement of purpose prepared by the Attorney General meets all the requirements of § 13-27-312(4), MCA, we will defer to his decision. Because the statement of purpose prepared by the Attorney

---

[2] Amicus Curiae argue that this Court should again alter the statement which was rewritten by the District Court, so as to provide what they deem to be an even better statement of purpose.

7

General is adequate to meet the requirements of the law, we decline to engage in an unnecessary comparison of such statements with those written by the District Court.

¶19    The statements of implication prepared by the Attorney General are:

> FOR limiting the increase in appropriations to the combined growth rate of population and inflation, or the largest spending limit for any previous biennium.

> AGAINST limiting the increase in appropriations to the combined growth rate of population and inflation, or the largest spending limit for any previous biennium.

¶20    Similar to its determination regarding the statement of purpose, the District Court determined that the Attorney General's statements of implication were not a true and impartial explanation of the measure because of the inaccurate references to "growth rate" rather than the "change" in population and inflation.  It rewrote those statements, again substituting "change" for "growth," and added to the statements that the voters can approve a higher spending limit.  In order to do this and remain within the fifty word limit imposed by § 13-27-312(2)(b), MCA,[3] the District Court deleted from the statements that appropriations could remain at the largest spending limit for any previous biennium.

¶21    For the same reasons stated in our consideration of the Attorney General's statement of purpose above at ¶ 15, we conclude that the use of the term growth, rather than change, does not render the statements of implication prepared by the Attorney General untruthful or biased.

---

[3]    Each statement of implication must contain no more than twenty-five words.

8

¶22  CI-97 provides that appropriations may remain at the largest spending limit for any previous biennium, and that the voters can approve a higher spending limit.  The District Court seems to agree with the Attorney General that the information that a cap on appropriations based on the factors of population and inflation is fairly included in the statements of implication.  The District Court did not give an explanation of why it determined that the ability of voters to approve a higher spending limit is of greater importance than that the measure allows appropriations to remain at the same level even if Montana's population decreases or deflation occurs.  Both are important parts of the measure.  However, this Court can discern no reason why one of these provisions of CI-97 is of greater import than the other.  Both are clearly set forth in the statement of purpose, and thus both will be before the voters when they cast their ballots.  We conclude that the statements of implication prepared by the Attorney General satisfy the statutory requirements of § 13-27-312(4), MCA, and, consequently, that the District Court erred in rewriting them.

¶23  The fiscal statement prepared by the Attorney General reads:

> This measure may require reduced future expenditures in several areas of government services where caseloads historically have grown at a rate exceeding combined growth in population and inflation, such as correctional population and Medicaid recipients, or may require reduced future expenditures in other areas to offset those increasing caseload costs.

¶24  Contrary to the argument of the Attorney General, we conclude that § 13-27-316, MCA, provides for court review of the fiscal statement attached to a proposed ballot measure where the proponents of the measure believe the statement does not satisfy the

9

requirements of § 13-27-312, MCA.  In *State v. Waltermire* (1986), 224 Mont. 230, 232,

730 P.2d 375, 376, this Court held:

> The legislative history of § 13-27-316, MCA, indicates that the legislature intended a clear and speedy means by which both proponents and opponents could attack the sufficiency of statements of purpose and implication and fiscal notes.  The statutory procedure allows district court and Supreme Court review for correction of any deficiencies so that the initiative might still be presented to the voters at the general election.

¶25 Because CI-97 has an effect on state expenditures, § 13-27-312(1), MCA, requires

the Attorney General to order a fiscal note incorporating such effect, the substance of

which must substantially comply with the provisions of § 5-4-205, MCA.  Section 5-4-

205, MCA, provides for the contents of fiscal notes presented to the Legislature during its

consideration of introduced bills having a fiscal impact.  It reads:

> Fiscal notes shall, where possible, show in dollar amounts the estimated increase or decrease in revenues or expenditures, costs which may be absorbed without additional funds, and long-range financial implications. No comment or opinion relative to merits of the bill shall be included; however, technical or mechanical defects may be noted.

Section 5-4-205, MCA.

¶26 The fiscal note requested by the Attorney General was prepared by the Governor's

Office of Budget and Program Planning.  It consists of a three-page letter, containing

some history of population growth and inflation in Montana, and noting that over the

long term it is likely that the level of services offered by state government will be reduced

as policymakers choose to reduce services rather than put additional measures on the

ballot.  The fiscal note says that the fiscal impact of the measure is unknown.  As

required by § 13-27-312(3), MCA, the Attorney General prepared the above fiscal

statement of no more than fifty words.

10

¶27 The District Court determined that the fiscal statement prepared by the Attorney General contained the same inaccuracy as the previous statements because it referred to growth rate, rather than change. Again, this Court disagrees with the District Court, for the same reasons stated in ¶ 15. Then, without stating why, the District Court also determined that the fiscal statement was confusing and misleading upon a cursory reading, and rewrote it.

¶28 Proponents argue that the Attorney General's fiscal statement is insufficient because it does not contain estimated dollar amounts of any anticipated increase or decrease in revenues or expenditures.

¶29 Upon review, the Court concludes that the fiscal statement prepared by the Attorney General is satisfactory, if not perfect, and satisfies the requirements of both §§ 13-27-312, and 5-4-205, MCA. Section 5-4-205, MCA, only requires that a fiscal note show dollar amounts when such is possible. The Office of Budget and Program Planning did not deem it possible to show its conclusions in dollar amounts. The record does not contradict such determination. Some possible long-range financial implications are mentioned in the Attorney General's fiscal statement but it does not appear from the record that such are untrue. The fiscal statement does not contain a comment or an opinion concerning CI-97, and it does not note any technical or mechanical defects in the measure. Also, upon review, the Court concludes that the Attorney General's fiscal statement is not confusing or misleading.

¶30 The Attorney General, as an alternative prayer, asks this Court to reverse the District Court's determination that signatures on petitions, which do not contain the same

statements as those appearing on the ballot, are nevertheless valid.  However, as we determine that the statements prepared by the Attorney General are sufficient, we need not reach this question.

¶31 This Court concludes that the statements of the Attorney General are sufficient to meet the applicable statutory requirements.  The June 14, 2006, Decision and Order of the District Court is reversed.  Proponents shall have no relief by their complaint.  CI-97 having qualified to be placed on the ballot[4] for the November 7, 2006, general election, shall be submitted to the electorate containing the statement of purpose, the statements of implication, and the fiscal statement as prepared by the Attorney General.

¶32 Remittitur shall issue forthwith.

/S/ JOHN WARNER

We Concur:

/S/ PATRICIA COTTER

/S/ W. WILLIAM LEAPHART

/S/ JIM RICE

/S/ BRIAN MORRIS

---

[4] The Court is advised that the Secretary of State has certified that CI-97 has qualified to be placed on the ballot.

Justice James C. Nelson dissents.

¶33     I am not able to join the Court's Opinion.

I.

¶34     *Should the District Court's determination to revise the Attorney General's statements be reversed?*

¶35     Before getting to the merits of the Court's decision, I note that the Court appears to fault the Attorney General for not "immediately" answering the Proponents' complaint. *See* ¶ 5. There is nothing in the law that requires the Attorney General to answer the Proponents' complaint "immediately." The record discloses that the Attorney General answered the Proponents complaint in a timely manner. Rule 12(a), M.R.Civ.P. Under this same rule, the Proponents could have moved to shorten the time for filing the Attorney General's answer, but they did not do so. Indeed, the District Court, *sua sponte,* could have shortened the time for filing the State's answer and, thus, further expedited the hearing and ruling on the Proponents' challenge. *See* § 13-27-316(3)(a), MCA (mandating that "[t]he action [challenging the attorney general's statement of purpose, implication of vote and fiscal statement] takes precedence over other cases and matters in the district court"). Yet, this matter proceeded through the court at the pace it did without any apparent objection from the Proponents. While the times for accomplishing court challenges under § 13-27-316, MCA, are extremely tight, given other provisions of Title 13, Chapters 2 and 3,[1] the finger of fault for any claimed delay should not be pointed at the Attorney General.

---

[1] With due respect, the Legislature should comprehensively review the statutory time frames for the whole initiative process. These time frames are unrealistic given the time it takes to formulate and obtain review of the proposed language for the petition, file and conclude court

¶36 Turning now to this Court's Opinion, the rationale and result of this Opinion is to disagree with the statements of purpose, the statements of implication, and the fiscal statement (hereinafter collectively referred to, where appropriate, as "the statements") as redrafted by the District Court, and to agree with and to reinstate the statements drafted by the Attorney General. Aside from my disagreement with the Court's decision in this regard, I note that in ¶¶ 1 and 15 of this Court's Opinion we provide our own statements of purpose and effect of CI 97. Since our decision here becomes the law of this case,[2] one is left to wonder whether this Court has, as a matter of law, now altered the statement of purpose of the Attorney General. If this Court is approving a statement of the Attorney General over that of the District Court, we ought not to insert yet a third statement, our own, into this mix—especially where this Court's statement likely trumps the other two.

¶37 Turning next to the statutes at issue here, §§ 13-27-310 through -316, MCA, may be summarized in the following fashion:

(a) The Attorney General is charged with the responsibility for drafting the statements which are to be placed on the circulation petition and on the official ballot. Sections 13-27-312 and -316(3)(b), MCA.

---

challenges and appeals, if any, and then circulate a petition with the approved statements so that both the statements on the petition and the ballot will be the same. *See* § 13-27-316(b), MCA. Moreover, the statutorily-imposed word limitations in § 13-27-312(2), MCA, for the various statements—100 words for the statement of purpose; 25 words each for the statements of implication; and 50 words for the fiscal statement—are equally unrealistic given the complexity of citizen initiatives—CI 97 being only one recent example. If the statements on the petition and ballot are truly intended to inform petition signers and voters in making an intelligent choice, then such statements must be sufficiently complete and understandable to accomplish that goal. The arbitrarily short word limitations imposed in the statutes frustrate that goal.

[2] *See Moody v. Northland Royalty, Co.* (1997), 286 Mont. 89, 92-93, 951 P.2d 18, 21-22 (whether right or wrong, the Supreme Court's decision is the law of the case, is a final determination, will not be reopened, and is binding upon the parties).

(b)    If either the proponents or opponents of the petition disagree with the Attorney General's statements, they may file a challenge in the Lewis and Clark County District Court requesting that the court "alter the statement or modify the attorney general's determination." Section 13-27-316(1), MCA.

(c)    The statement certified by the court must be placed on the petition which will be circulated and on the official ballot. Section 13-27-316(3)(b), MCA.

¶38    With this statutory scheme in mind, we state in ¶ 10 that "mixed questions of law and fact" are presented to this Court. I am not clear from the Court's Opinion what "facts" are at issue here or are even relevant. While the District Court held a hearing before making its decision,[3] it appears from the Clerk of Court's docket entries that the hearing was not held to receive factual evidence, but rather, was held simply to receive oral argument on the parties' respective legal positions and on the trial court's statutory authority to review and alter the Attorney General's statement. The record does not disclose any "fact-finding" by the trial judge. And, not surprisingly, this Court's Opinion does not refer to any material "facts" which are implicated in its decision. The language of the statements of the Attorney General and that of the District Court are undisputed. They are what they are.

¶39    In this regard, the Court's error in articulating and applying the mixed law and fact standard of review is two-fold.

¶40    First, as noted above, no "facts" are being reviewed as the trial court did not find any facts. The District Court's decision was purely a legal assessment of the Attorney General's statements, which language is not in dispute. As is with the review of any legal error, the proper standard is *de novo* or plenary. *In re Marriage of Robison,* 2002 MT

---

[3] No transcript of that hearing has been presented to this Court.

15

207, ¶ 15, 311 Mont. 246, ¶ 15, 53 P.3d 1279, ¶ 15. The District Court's task was simply to determine whether the Attorney General's statements met the statutory requirements of § 13-27-312, MCA. The trial judge has no discretion to simply insert her language in place of the Attorney General's because she thinks it might read better or make more sense. Under § 13-27-316(3)(a), MCA, the court is to "examine the proposed measure and the challenged statement or determination of the attorney general and . . . certify to the secretary of state a statement which the court determines will meet the requirements of 13-27-312 or an opinion as to the correctness of the attorney general's determination." This determination must, of necessity, be made by examination of the language of the measure itself and the information provided by the budget director pursuant to § 13-27-312(1), MCA. It is a legal determination, not a factual one.

¶41 Second, it is the District Court's legal conclusions about *why* the Attorney General's statements do not pass statutory muster that is critical to its decision and to our review. If the District Court's legal conclusions in this regard are correct, then the language that the trial court substituted for that language used by the Attorney General must be reviewed to insure that the court's language is legally correct. Both of these inquiries are legal determinations, not factual ones.

¶42 Section 13-27-312, MCA, offers scant guidance to an attorney general attempting to comply with its provisions. With the advice of the parties, § 13-27-312(2), MCA,[4] requires a statement explaining the purpose of the measure and statements explaining the implications of a vote for or against the measure, and § 13-27-312(3), MCA, requires a

_____

[4] I do not reiterate here the matter of the word limitations set forth in these statutes, which, as noted above, I suggest are wholly unrealistic.

fiscal statement prepared from information furnished by the budget director under § 13-27-312(1), MCA. Section 13-27-312(4), MCA, imposes the obligation on the attorney general that the statements be *truthful and impartial*, easily understood, not argumentative, and not prejudicial for or against the measure.

¶43 At this point, it is useful to compare the two statements of purpose at issue. The Attorney General's statement of purpose reads:

> The Montana Constitution currently prohibits appropriations by the legislature that exceed anticipated revenue. This measure adds a constitutional spending limit that would prohibit increases in appropriations greater than the combined growth rate of population and inflation. It allows appropriations up to the largest spending limit for any previous biennium. Emergencies, debt payments, pro-rata tax rebates, various appropriations expressly provided by the Montana Constitution, and expenditures from funding sources including the federal government, constitutionally created trusts, and certain user fees are not included in the spending limit. The legislature may exceed the spending limit only with voter approval.

Conversely, the District Court's reiteration of the Attorney General's statement of purpose states:

> This measure restricts increases in state government spending by adding a spending limit to the Montana Constitution. Total increases in appropriations by the legislature would be limited to the combined change in population and inflation, unless the spending limit for any previous biennium would be higher. The legislature could not exceed this limit without voter approval. Exceptions include, generally, federal monies, constitutionally created trusts, emergencies, debt payments, highway revenues, and some user fees. Any Montana resident or business could sue to enforce the measure and, if successful, receive costs and attorney fees. The measure would apply to the next legislature.

¶44 At ¶ 14 of this Court's Opinion, we fault the District Court for concluding that the Attorney General's statement of purpose was untrue. That, of course, is one of the determinations under the statute, the District Court Judge was obligated to make. So *why*

17

is the trial court's conclusion incorrect as a matter of law? Our answer, found at ¶¶ 15 and 16, is in this Court's substituted determination of the purpose of the initiative and the appropriate language that should be included in the statement—which as noted before, is different than either the Attorney General's or the District Court's. The mere fact that this Court disagrees with the legal conclusions of the District Court does not explain *why* the latter court's conclusions are wrong as a matter of law. There is a complete lack of analysis in the Court's Opinion on this point.

¶45 The District Court grounded its decision in its comparison of the actual text of the measure with the Attorney General's use of "growth rate" of population and inflation not found in the text. For that reason, the District Court substituted the word "change" which is actually found in the text of the measure. Moreover, pursuing that same approach, the District Court Judge observed that the Attorney General omitted salient provisions of the measure needed to make the statement of purpose true—as § 13-27-312(4), MCA, plainly requires. In the context of the statutory scheme, a "true" statement is not one that is simply not false. A partial statement, while containing no false information itself, may not be "true" without the inclusion of other information that accurately represents the language of the measure. While "truth" may be a somewhat subject concept, we, at least, owe the parties and the trial court some definition of what constitutes a true statement under the statutory scheme.

¶46 However, as noted, this Court's Opinion offers no legal analysis or rationale explaining *why* the District Court's conclusions and language are legally incorrect. This

18

Court simply spins its decision with its own reiteration of what it thinks is the initiative's purpose.

¶47 Indeed, this Court concedes at ¶ 18 that the District Court's conclusions are not "patently wrong" and suggests that the trial judge's statement might even be "preferable" to the Attorney General's statement.[5] That begs the obvious question, if the District Court Judge is not "patently wrong" and if her statement of purpose might even be "preferable" to the Attorney General's, then why are we reversing the trial court? How wrong, exactly, or right does she have to be? The statutory scheme requires the statements to be "true," "easily understood," not argumentative, and not prejudicial. Section 13-27-312(4), MCA. *Why* the District Court's statements failed to meet these statutory criteria and *why* the Attorney General's do, is not explained in the Court's Opinion.

¶48 However, the reason for this lapse is likely in this Court's preference for its own reiteration of the statement of purpose—*see* ¶¶ 1 and 15—and its preference for this statement of purpose as being more in line with the Attorney General's. Indeed, the Court's insertion of its own view into this matter, at the expense of its review of the District Court's decision for actual legal error, is manifest in the Court's further holding that the Attorney General's statement of purpose is also in "plain, easily understood language that is not drafted so as to create prejudice for or against the measure," *see* ¶ 18—grounds that were not even addressed by the District Court, *see* ¶ 14. The trial court ruled only that the Attorney General's statements were not true.

---

[5] Ironically, the Court then goes on to suggest that this Court or individual Justices might even do a better job of drafting. Acting on its own suggestion, unfortunately, this is what the Court does at ¶¶ 1 and 15.

¶49 Our enthusiasm for reversing the District Court and reinstating the Attorney General's language in the statement of purpose has, unfortunately, led to this Court substituting its judgment for that of the trial court. What is lacking in this Court's Opinion is any analysis and discussion of the actual language of the measure and how that language is best summarized so as to fulfill the statutory requirements of § 13-27-312(4), MCA—i.e., so that, within the context of the measure, the statement of purpose is "true," "impartial," written in "plain, easily understood language," and not argumentative or so as to "create prejudice for or against the measure." We owe it to the Attorney General and the District Court Judge to perform this analysis, and our failure to do so leaves the Court's decision as little more than the majority's gut reaction that the Attorney General's language is good enough for government purposes. That really is no decision at all; we establish no legal precedent as to how these sorts of disputes should be resolved in future challenges, leaving, instead, each to be decided on the sort of shoot from the hip approach used here.

¶50 As to this Court's discussion of the statements of implication of vote and the fiscal statement, but without going into the detail of those, I, likewise, reach the same conclusions as to this Court's failure to properly analyze the trial court's language vis-à-vis the Attorney General's language given the requirements of § 13-27-312(4), MCA, the information provided by the budget director, and the language of the measure. Without more, I conclude that the District Court properly exercised its statutory authority and obligation under § 13-27-312(4), MCA, to render the statements truthful—again, grounded in its conclusion that the Attorney General's statements did not track the textual

20

language or the effect of the measure itself. Indeed, I agree with the District Court that the Attorney General's fiscal statement, *see* ¶ 23, would be misleading and confusing to the ordinary lay petition-signer and voter. Again, as with its holding in ¶ 18, the Court concludes that the Attorney General's statement is good enough—it is "satisfactory, if not perfect," *see* ¶ 29—and thus suffices to pass statutory muster. *Why* the trial court's determination to rewrite the fiscal statement based on the text of the measure is legally incorrect is not explained in the Court's Opinion, however.

¶51     Summarizing my dissent with respect to this Court's reversal of the District Court's determination to rewrite the Attorney General's statement, this Court's Opinion at once concedes that the trial judge was not "patently wrong"; that her reiteration of the statements might even be preferable; that the Attorney General's statements were only satisfactory and adequate, though not perfect; and that the Attorney General's statements are correct (because this Court's own restatement of the purpose, implication and fiscal implications of the measure are closer to those of the Attorney General's). There is no explanation of *why* the District Court's determinations—grounded in the actual text of the measure itself and information provided by the budget director—are incorrect, as a matter of law. We have failed in our obligation to conduct a *de novo* review of the trial court's legal conclusions. Rather, we have simply substituted our judgment—and our re-iteration of the statements—for those of the trial judge. We give no legal guidance to the district courts or to the Attorney General, and we establish no parameters for future similar challenges.

¶52 Accordingly, I dissent from the Court's decision. I would affirm the District Court.

II.

¶53 *Should signatures collected on illegal circulation petitions be declared invalid?*

¶54 Since I would affirm the District Court on the first issue, that leads me to the place where I must part company with the District Court on the second issue. The Attorney General argues that if his statements are held not to satisfy § 13-27-312, MCA,—i.e., if the District Court is affirmed—then the signatures collected by the Proponents on petitions using the Attorney General's statements may not be counted in qualifying the constitutional initiative to appear on the ballot. Primarily, the Attorney General relies on § 13-27-316(3)(b), MCA, contending that the statutory scheme requires that Proponents' ballot statement disputes be resolved before signature gathering so that no signatures are obtained by means of an illegal petition.

¶55 The trial judge ruled that the statements on the petition and the statements on the official ballot could be different because the "statements contained on the circulating petitions are [not] so inaccurate or misleading as to warrant invalidating signatures already gathered." The District Court relied on *State ex. rel. Boese v. Waltermire* (1986), 224 Mont. 230, 730 P.2d 375. However, as the Attorney General points out, that decision is inapposite because there the proponents' challenge to the Attorney General's ballot statements was resolved before the petition was circulated to the voters. The statements on the petition for circulation and on the official ballot *were* the same. *Boese*, 224 Mont. at 231, 730 P.2d at 376.

22

¶56    Moreover, the District Court Judge reasoned here that

> the accuracy of the statements is more critical to the voter in the voting booth than to voters signing the petition. The ballot does not contain the actual text of the initiative, so these statements are the only information presented to voters at the time of choosing how to vote on the measure. Signers of the petition, however, have available to them the full text of the initiative and, in addition are deciding whether to place the measure on the ballot, not whether they actually wish to enact it.

¶57    The Proponents advance a similar line of reasoning as the District Court's, quoting the foregoing paragraph. Additionally, the Proponents state that "[s]igners of the petition also have the benefit of being able to ask questions about the measure from the people gathering the signatures." Finally, Proponents argue that invalidating the signatures violates their constitutional right to seek full legal redress from the courts. As to this last argument, Proponents reason that if they cannot collect signatures until the District Court and the Supreme Court finally rule on their challenges, they are not provided sufficient time and opportunity to obtain enough signatures under the rewritten statement of purpose, thereby preventing them from placing the measure on the November ballot. This situation, according to Proponents, forces citizens to choose between pursuing their right under § 13-27-316(1), MCA, to petition the district court for redress, or to not seek redress so that signatures can be collected without being invalidated. Proponents also argue that there is no statutory provision that requires them to obtain a final decision from the District Court and from this Court before beginning to gather signatures.

¶58    Neither the District Court nor the Proponents are correct. The trial court's conclusion that the "statements contained on the circulating petitions are [not] so inaccurate or misleading as to warrant invalidating signatures already gathered" begs the

fundamental question. If, in fact, the trial judge's reasoning is correct, then why did the court invalidate the statements of the Attorney General in the first place? The statements cannot on the one hand be so untruthful, inaccurate and misleading as to prevent them from being on the ballot, yet, at the same time, be not so untruthful, not so inaccurate and not so misleading so as to prevent them from appearing on the petition for circulation. Either the statements are true, accurate and not misleading or they are not. If, indeed, there is no material or substantive difference in the language substituted by the court for that of the Attorney General's, then this entire litigation and appeal simply exalts form over substance in violation of § 1-3-219, MCA; it is nothing more than an exercise in elevating the sublime over the ridiculous.

¶59 The statutory scheme enacted by the Legislature clearly and unambiguously requires: (a) that the statements be "true," "impartial," written in "plain, easily understood language," and not argumentative or so as to "create prejudice for or against the measure," § 13-27-312(4), MCA, and (b) that the statements certified by the court— here, this Court's own statement or the Attorney General's (I am unsure)—"*must be placed on the petition for circulation and on the official ballot.*" Section 13-27-316(3)(b), MCA (emphasis added). There is nothing in the statutory scheme that allows the statements on the petition for circulation and on the official ballot to be different. Indeed, § 13-27-316(3)(b), MCA, clearly and unambiguously requires precisely the opposite.

¶60 The District Court's and Proponents' reasoning that the accuracy of the statements is more critical to the voter in the voting booth than to voters signing the petition is

fallacious. As noted, the trial court and Proponents observe that because the ballot does not contain the actual text of the initiative, the statements are the only information presented to the voters at the time of choosing how to vote on the measure. According to the District Court and the Proponents, signers of the petition, on the other hand, have available to them the full text of the initiative and, in addition, are deciding whether to place the measure on the ballot, not whether they actually wish to enact it.

¶61    As noted above, the flaw in this line of reasoning is that it ignores the plain and unambiguous requirement of the statutory scheme that the statements on the circulation petition be "true," "impartial," written in "plain, easily understood language," and not argumentative or so as to "create prejudice for or against the measure" and that the statements be the same on both the petition for circulation and on the official ballot. Sections 13-27-312(4) and -316(3)(b), MCA. The trial court's and Proponents' rationale is that untruthful, partial, argumentative, not easily understood, and prejudicial statements can be on either the circulation petition or the ballot; it does not matter. That is not what the black-letter law allows, however.

¶62    It is also black-letter law—so often cited that the cases are legion—that

> [i]n the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.

Section 1-2-101, MCA. It is this Court's and every court's "duty . . . to construe the law as it is written." *In re Estate of Magelssen* (1979), 182 Mont. 372, 378, 597 P.2d 90, 94 (citing § 1-2-101, MCA). Moreover, "[i]n the construction of a statute, the intention of the legislature is to be pursued if possible." Section 1-2-102, MCA. In ascertaining the

25

Legislature's intent, "it is beyond dispute that . . . we are bound by [the] plain and unambiguous language used in a statute and may not consider legislative history or any other means of statutory construction," *McKirdy v. Vielleux*, 2000 MT 264, ¶ 22, 302 Mont. 18, ¶ 22, 19 P.3d 207, ¶ 22 (citing *MacMillan v. State Compensation Ins. Fund* (1997), 285 Mont. 202, 208, 947 P.2d 75, 78), absent there being an ambiguity in the statute. "If no ambiguity exists in a statute, the letter of the law will not be disregarded under the pretext of pursuing its spirit." *Magelssen*, 182 Mont. at 378, 597 P.2d at 94 (citing *Vaughn & Ragsdale v. State Board of Equalization* (1939), 109 Mont. 52, 60, 96 P.2d 420, 424).

¶63    On the one hand, Proponents demand that the courts follow the law when it is to their benefit, but they demand that the courts ignore the law when it is not to their advantage. Such an argument is disingenuous; Proponents cannot have it both ways. Indeed, in ignoring the fundamental rules of statutory construction, the Proponents urge a judicially-activist, result-oriented approach upon the courts.

¶64    Similarly, Proponents' argument that "[s]igners of the petition also have the benefit of being able to ask questions about the measure from the people gathering the signatures" is even more untenable. In the first place, nothing in the statutory scheme even remotely suggests that petition signers are to obtain information about the measure from the signature gatherers. The statutes enacted by the Legislature require that petition signers and voters alike, be informed about the measure from the approved and identical statements on, respectively, the petition for circulation and the official ballot. Sections 13-27-312 and -316(3)(b), MCA.

26

¶65   In the second place, the implicit argument that signature gatherers are competent to truthfully and impartially explain to potential petition signers the purpose, fiscal impact, and vote implications of a complex, proposed constitutional amendment such as the one at issue here (it covers three pages, single spaced, and is written in legalese) is patently ludicrous.  Signature gatherers typically are not attorneys.  Many are volunteer lay persons and some are hired, often from out of state, to obtain signatures for pay.  Collective common experience is that most professional signature gatherers do not have a clue about what they are asking people to sign.  The simplistic explanations of a measure given by such persons, in a legal sense, are typically neither true nor impartial, but rather, are prejudicial and misleading—all contrary to the legislative scheme discussed above.  Signature gatherers, by definition, volunteer or are hired and paid to promote the petition, argue for it and encourage people to sign it.  *A fortiori,* signature gatherers' statements are prejudiced in favor of the measure—contrary to what § 13-27-312(4), MCA, specifically requires.

¶66   Indeed, when such persons give legal interpretations of the purpose, voting implications and fiscal effects of a measure, it is likely that they are engaged in the unauthorized practice of law in even giving such advice.  *See* § 37-61-201, MCA.

¶67   Common experience is also that neither typical petition signers nor voters have read, much less understand, the entirety of a proposed constitutional amendment as lengthy and as complex as the one at issue here.  It is precisely for this reason that the peoples' representatives in the Legislature enacted a statutory scheme requiring identical statements on both the petition for circulation and official ballot that are "true,"

27

"impartial," written in "plain, easily understood language" and not argumentative or so as to "create prejudice for or against the measure." Sections 13-27-312(4) and -316(3)(b), MCA. Proponents' arguments to the contrary, this legislative scheme does not envision that petition signers will be fairly or intelligently informed about the measure from the very people who, voluntarily or for pay, are promoting the measure. The Legislature determined that both petition signers and voters be informed about the measure from the same source—the identical, approved statements authorized by §§ 13-27-312 and -316(3)(b), MCA.

¶68 Again, Proponents' argument urges the courts to ignore the plain language of the statutes and to adopt an activist, result-oriented approach that works to their advantage.

¶69 The statutes at issue may not be simply ignored because the District Court believes the statements it rejected are "true enough" for the petition but "not true enough" for the ballot. The legislative scheme does not permit this result, but rather, requires precisely that the statements on the petition for circulation and on the official ballot be the same. Section 13-27-316(3)(b), MCA. Nor may Proponents demand that the courts ignore the law because, having won their challenge in the District Court, they must now live with the adverse consequences that flow from their victory. The law cannot be applied in such a pharisaical manner.

¶70 Finally, Proponents' argument that enforcing the law deprives them of their right of access to the courts is equally without merit. In point of fact, Proponents have had full access to the courts in this case. If the legislative scheme requires time frames that are difficult to negotiate and which are unrealistic (and as I have noted above, that may be

28

the case) then Proponents' remedy is to challenge the constitutionality of the statutory scheme or to seek legislative amendment of the offending statutes. Proponents may not seek to have the District Court or this Court simply legislate from the bench and ignore statutes not to the Proponents benefit or liking. As stated above, this approach simply urges courts to be activist and result-oriented.

¶71 On this issue, I would reverse the District Court, and I would invalidate petitions which contain the untrue, misleading and inaccurate language that the District Court revised.

¶72 On the basis of the foregoing, I dissent.

/S/ JAMES C. NELSON

Chief Justice Karla M. Gray, dissenting.

¶73 I respectfully dissent from the Court's reversal of the District Court regarding the sufficiency of the Attorney General's statements. I join the portions of Justice Nelson's dissent that relate directly to the legal merits on that issue, and would affirm the District Court. Consequently, like Justice Nelson, I must address the District Court's determination that the signatures gathered on petitions containing the Attorney General's flawed statements are not invalid. Unlike Justice Nelson, I would affirm the District Court on that issue as well.

¶74 Section 13-27-316(3)(b), MCA, provides that "[a] statement certified by the court must be placed on the petition for circulation and on the official ballot." The State of Montana argued in the District Court—as it does here—that if a court certifies a statement, it must then invalidate petitions and signatures thereon which contain the Attorney General's flawed statements. The District Court relied on *State ex rel. Boese v. Waltermire* (1986), 224 Mont. 230, 730 P.2d 375, in finding the State's argument "unpersuasive." There, this Court addressed § 13-27-316(2), MCA, in the initiative statutes, which gives opponents of a ballot measure a 10-day period to institute a legal challenge to the Attorney General's statements about the measure; that subsection, of course, is the "flip side" of § 13-27-316(1), MCA, the same 10-day period utilized by Proponents of the ballot measure before us in the present case. We concluded that the Legislature's intent was to provide "a clear and speedy means by which both proponents and opponents could attack the sufficiency" of an attorney general's statements, and to allow trial court and Supreme Court review "for correction of any deficiencies so that the initiative might still be presented to the voters at the general election." *Boese*, 224 Mont. at 232, 730 P.2d at 376. Here, the District Court reasoned that invalidating the previously gathered signatures would contravene these purposes. The District Court also stated that, while the Attorney General's statements were insufficient and warranted correction, they were not "so inaccurate or

30

misleading as to warrant invalidating signatures already gathered." I agree entirely with the District Court.

¶75 The State attempts to distinguish *Boese* on grounds that an opponent's challenge pursuant to § 13-27-316(2), MCA—rather than a proponent's challenge pursuant to § 13-27-316(1), MCA—was at issue in that case, and the challenge in *Boese* took place before the petition was circulated, unlike the challenge in this case. These factual distinctions do, of course, exist. They do not impact in any way, however, on the gravity and weight of our statements in *Boese*, or on the importance of the constitutional right of the people of Montana to amend law or the Constitution itself via the initiative process. *See* Art. III, Sec. 4, and Art. XIV, Sec. 9, Mont. Const.

¶76 The State also contends the purposes stated in *Boese* are frustrated here because § 13-27-316(1), MCA, and other statutes are designed to prevent proponents of ballot measures from "lying in wait in the weeds" so they may collect signatures under one set of statements and seek votes under another. Given the State's conduct and arguments in the matter now before us, this contention should offend every citizen of Montana regardless of his or her views on this ballot measure. It certainly offends me.

¶77 It is undisputed in this case that Proponents timely filed their complaint pursuant to § 13-27-316(1), MCA, on March 13, 2006. Summons issued that day and was served on the Attorney General the following day, March 14, 2006. Proponents filed an amended complaint, containing relatively minor changes, on March 22 and served it on the Attorney General the same day. The State's answer was not filed until April 21, 2006. It is fair to inquire which party was "lying in wait in the weeds" with regard to moving this litigation forward.

¶78 Moreover, it is my view that any notion by the State that *Proponents* desired to seek signatures under one set of statements and votes under another is ludicrous in light of the fact that the timing of the petition and signature gathering processes—pursuant to the statutory requirements—essentially forced them to collect signatures on petitions containing the very statements by the Attorney General which they timely challenged in the District Court and on which they prevailed there and should prevail here. Indeed, some of the State's contentions in this appeal cause me concern about its commitment to the initiative process.

¶79 Returning to the State's reliance on § 13-27-316(3)(b), MCA, the State argues that, because the court's certified statements must be placed on the petition for circulation thereunder, and in this case were not, the signatures on Proponents' petitions must be invalidated (thereby, of course, prohibiting the initiative from being placed on the ballot for a vote). In interpreting statutes, courts employ principles designed to give effect to the legislative will, to avoid an absurd result, to view the statute as a part of a whole statutory scheme and to forward the purpose of that scheme. *Orr v. State*, 2004 MT 354, ¶ 25, 324 Mont. 391, ¶ 25, 106 P.3d 100, ¶ 25 (citation omitted). Here, the plain language of § 13-27-316(3)(b), MCA, states that any statement certified by the court must be placed both on the petition for circulation and on the official ballot, and supports the State's argument. It is my view, however, that application of that language in these circumstances would frustrate the overall purpose of § 13-27-316, MCA, which is intended, ultimately, to afford Montana voters the opportunity to vote on an initiative—with statements which meet statutory requirements to assist in their understanding. In

32

this respect, I agree with the District Court's implicit characterization of its corrections in this case as clarifications, rather than major alterations calling into question the validity of the signatures.

¶80 In addition, I believe a literal construction of § 13-27-316(3)(b), MCA, leads to an "absurd result," in that it penalizes the proponents of a proposed initiative—whether they be the Governor, labor unions or Proponents here—for successfully challenging an attorney general's statements and ensuring that legally appropriate language is placed before Montana voters. Indeed, a future unscrupulous attorney general could intentionally write biased and inaccurate statements of purpose and implication and then, when those statements were rejected by a court, play the final "trump card" by successfully urging application of the language in § 13-27-316(3)(b), MCA. I cannot believe the Legislature intended to vest such power in an attorney general. I also am concerned that future initiative proponents might face the "Hobson's choice" of accepting an attorney general's insufficient—even biased and inaccurate—statements or risking the loss of previously gathered signatures after a successful court challenge.

¶81 Finally, heeding *Orr*'s reminder of the importance of viewing a statute as part of an entire statutory "scheme," I observe § 13-27-312(5), MCA, provides that "[t]he statement of purpose, *unless altered by a court under 13-27-316*, is the petition title for the measure circulated by the petition and the ballot title if the measure is placed on the ballot." (Emphasis added.) I interpret this language to mean that—if a court alters the statement of purpose pursuant to § 13-27-316, MCA, between the gathering of signatures and the finalizing of the ballot—the petition title and ballot title necessarily cannot be the same and, therefore, the signatures on a petition with a statement of purpose differing from that on the ballot are valid. Indeed, I believe the "unless

33

altered" language in § 13-27-312(5), MCA, reflects legislative anticipation of the very circumstance presented here—a court's alteration of a statement of purpose between the time allowed for gathering signatures via petition and finalizing the ballot.

¶82 I dissent from the Court's opinion reversing the District Court's determination that the Attorney General's statements were not sufficient, and from its resulting failure to address whether the District Court correctly refused to invalidate the signatures. I would affirm the District Court in both respects.

/S/ KARLA M. GRAY