

DA 06-0663

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 270

IN RE THE MARRIAGE OF:

JULIE THORNER, f/k/a JULIE M. DAVIS,

     Petitioner, Appellee and Cross-Appellant,

  and

RONALD S. DAVIS,

     Respondent and Appellant.

| | |
|---|---|
| APPEAL FROM: | District Court of the Eighteenth Judicial District, In and For the County of Gallatin, Cause No. DR-04-161 Honorable John C. Brown, Presiding Judge |

COUNSEL OF RECORD:

     For Appellant:

        Christopher J. Gillette, Attorney at Law, Bozeman, Montana

     For Appellee:

        James D. McKenna, Walsh & McKenna, Bozeman, Montana

Submitted on Briefs:  August 9, 2007

Decided:  August 5, 2008

Filed:

_____
Clerk

Justice John Warner delivered the Opinion of the Court.

¶1    Ronald Davis (Ron) appeals, and Julie Thorner (Julie), formerly Julie Davis, cross-appeals from an order entered in the Eighteenth Judicial District Court, Gallatin County, dissolving their marriage, distributing the marital estate, and ordering a parenting plan for their two minor children.

¶2    Ron appeals the provisions of the decree ordering that Julie shall have primary custody of the parties' two minor children during the school year in North Carolina.  He also appeals the distribution of the retirement account portion of the marital estate because it denied him a percentage of the increase in Julie's retirement account that accrued between the time of the parties' separation and the time of the decree.

¶3    Julie cross-appeals, asserting that she should be able to fulfill her monetary obligation by distributing to Ron pre-tax retirement funds instead of cash and that she should not be required to pay interest on the amount she owes him until the date payment was due, February 28, 2007.

¶4    We restate and discuss the issues on appeal as follows:

¶5    Issue 1:  Did the District Court err in ordering that Julie retain primary custody of the children in North Carolina during the school year?

¶6    Issue 2:  Did the District Court err by not including the post-separation appreciation of Julie's retirement account in its calculation of the marital estate's value?

¶7    Issue 3:  Did the District Court err in ordering that Julie pay Ron the entire amount owed to equitably distribute the marital estate in cash without considering the tax implications of an early withdrawal from Julie's retirement account?

¶8    Issue 4: Did the District Court err in ordering that Julie pay Ron interest on her obligation to Ron before the date it was due?

**BACKGROUND**

¶9    Julie and Ron were married in Illinois in October 1995. Two children were born of the marriage. The youngest child was born with a heart condition that is currently stable and does not impact the parenting plan at issue here. Julie is a corporate marketing executive. Ron is an electrician.

¶10    After living several years in Colorado, the couple signed a contract to purchase a Montana business. In June 2003, Ron moved to Bozeman to begin learning the business. Julie and the children moved to Bozeman later that summer. Both intended to continue working in their previous occupations because they anticipated that the business would not be immediately profitable. Julie worked remotely for her Colorado employer. Ron eventually found work as an electrician in Bozeman. The purchase of the business fell through due to problems unrelated to this proceeding.

¶11    Julie petitioned for dissolution on April 27, 2004. Since that time, the parties have maintained separate finances. Despite the hostility between them, the couple continued to live together until July 2004, when they physically separated and maintained separate households.

¶12    Over the course of the next two years, while the divorce was pending, the children lived primarily with Julie, spending every other weekend and every Wednesday dinner with Ron under a verbal parenting arrangement. Julie, through her attorney, made several

3

requests for support. However, Ron did not pay interim maintenance or child support.

¶13 Julie moved the District Court for an order allowing her to relocate to North Carolina with the children. She had found an employment opportunity in Bryson City, North Carolina, where she had previously worked and lived prior to attending business school. In February 2005, the District Court, considering the fact that their eldest son was midway through his second year in school and the divorce was not yet final, found:

> it would be in the best interest of the children at this time to retain the children in a familiar environment and routine until a final decree of dissolution and parenting plan are entered in this matter.

The court ordered that the children stay in Bozeman with Julie, and if she moved to North Carolina, the children were to stay in Bozeman with Ron until the dissolution was final.

¶14 Not wanting to move without the children, Julie stayed in Bozeman. Having been laid off by her Colorado employer, she accepted the job in North Carolina. Her new employer allowed her to begin working remotely as long as she traveled frequently to North Carolina until she moved there. This arrangement was understood to be temporary.

¶15 In June 2005, the court ordered the parties to appoint an investigator or parenting evaluator to determine the best interests of the children. The parties did so, and the court considered the evaluation in its final decree of dissolution and parenting plan.

¶16 Trial was held on May 25 and 26, 2006. Substantial testimony and documentary evidence was presented. On August 28, 2006, the court made the following findings of fact:

> 22. . . . Both parties agree that the children should, to the extent feasible, have frequent and continuing contact with each parent. However, Julie desires to change her residence, and that of the boys, to North Carolina because of her employment opportunities in North Carolina . . . . Ron desires

that the children remain in Montana, with equal time and equal access for each parent.

. . .

25. . . . Although the report states that the children should reside with Julie if she "must" relocate to North Carolina, the report clearly states that this option is "less desirable" and only "probably workable." The Court does not find that Julie "must" move to North Carolina but it does find that her desire to do so, under the circumstances, is reasonable and is in the best interests of the children.

. . .

30. As noted in the parenting evaluation report, both children, and especially [T.D.], are very attached to Julie. Julie has been the primary caregiver for each of the children since birth, and the children should continue to live with Julie.

31. The parties moved to Montana in September of 2003. The marriage dissolution action began in April of 2004, and the family has not been able to establish strong connections or "put down roots" in this area. In fact, [T.D.'s] best friend moved with his family to the state of Washington this summer. Although the parenting evaluation report notes that a move to North Carolina will, at least for the first few months, be difficult for the children, there is no evidence to show that such a move will cause significant or lasting problems for the children.

. . .

33. This Court is bound to apply the best interests of the children standard. While the Court believes it is in the children's best interests to maintain frequent contact with both parents, the Court finds that allowing the children to move to North Carolina with their mother is in their best interest.

¶17 The District Court concluded that relocating to North Carolina with Julie was in the children's best interests. The District Court ordered that the children spend two months every summer, every spring break through 2009, then alternating, and every other Christmas vacation with Ron in Montana. In addition, Ron was permitted to visit them for one week every month in North Carolina with proper advance notice to Julie. The District Court also

5

ordered a contingent parenting plan to take effect if Ron moved to North Carolina.

¶18 After considering the evidence presented concerning the parties' debts, assets, and contributions to the marital estate, and after giving Julie credit for back child support owed by Ron, the District Court ordered Julie to pay Ron $51,990 on or before February 28, 2007. The court also ordered that Julie pay interest on this amount at ten percent per annum from the date of the decree (August 28, 2006) until paid.

¶19 Ron appeals the District Court's order granting Julie primary custody of the children and thus allowing her to relocate with their children to North Carolina. He also challenges the amount that Julie was ordered to pay him. Julie cross-appeals the court's determination that she pay Ron the entire amount she owes him in cash, rather than distribute to him a portion of her retirement account and avoid harsh tax consequences. She also cross-appeals the court's order that she pay interest on the amount owed between the time the decree was entered and the time it was due.

## STANDARD OF REVIEW

¶20 We review a district court's findings of fact, including those underlying a dissolution proceeding, parenting plan, and division of marital assets, to determine if they are clearly erroneous. *Bock v. Smith*, 2005 MT 40, ¶ 14, 326 Mont. 123, ¶ 14, 107 P.3d 488, ¶ 14. A finding is clearly erroneous if it is not supported by substantial evidence, the district court misapprehended the effect of the evidence, or our review of the record convinces us the district court made a mistake. *In re Paternity of C.T.E.-H.*, 2004 MT 307, ¶ 15, 323 Mont. 498, ¶ 15, 101 P.3d 254, ¶ 15. Where the court's findings are not clearly erroneous, we will

reverse a district court's parenting plan decision only where an abuse of discretion is "clearly demonstrated." *In re Marriage of Carter*, 2003 MT 19, ¶ 9, 314 Mont. 84, ¶ 9, 63 P.3d 1124, ¶ 9.

¶21 The valuation and distribution of a marital estate is a discretionary district court ruling that we review for an abuse of discretion. *Bock*, ¶ 14. The test for an abuse of discretion is whether the district court acted arbitrarily without the employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. *In re Marriage of Herrera*, 2004 MT 40, ¶ 18, 320 Mont. 71, ¶ 18, 85 P.3d 781, ¶ 18; *In re Marriage of Meeks*, 276 Mont. 237, 242, 915 P.2d 831, 834 (1996). A district court may abuse its discretion if it fails to consider a concrete and immediate tax liability when its property distribution order precipitates such tax liability. *In re Marriage of Haberkern*, 2004 MT 29, ¶ 17, 319 Mont. 393, ¶ 17, 85 P.3d 743, ¶ 17; *In re Marriage of Lee*, 249 Mont. 516, 519-20, 816 P.2d 1076, 1078 (1991). Conversely, a district court does not abuse its discretion when it does not consider tax liabilities when such liabilities are not imminent taxable events. *Haberkern*, ¶ 17; *In re Marriage of DeBuff*, 2002 MT 159, ¶¶ 48-50, 310 Mont. 382, ¶¶ 48-50, 50 P.3d 1070, ¶¶ 48-50. Finally, we review a district court's conclusions of law to determine if they are correct.

## DISCUSSION

¶22 *Issue 1: Did the District Court err in ordering that Julie retain primary custody of the children in North Carolina during the school year?*

¶23 The District Court was required to weigh the best interests of the children along with Julie's fundamental right to travel interstate. *See In re Marriage of Cole*, 224 Mont. 207, 213, 729 P.2d 1276, 1280 (1986). Ron argues that the evidence presented clearly showed that staying in Bozeman with regular weekly contact with both parents would be in the best interests of the children and that Julie's moving to North Carolina for a professional opportunity was unnecessary because equivalent work existed in the Bozeman area.

¶24 Section 40-4-212, MCA, requires the court to consider the child's best interests when presented with a contested parenting plan. The relevant factors include but are not limited to the wishes of the child's parents; the interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interests; the child's adjustment to his home, school, and community; and the continuity and stability of care. Section 40-4-212, MCA.

¶25 The District Court's findings of fact demonstrate that it considered the relevant statutory factors. The court made a finding as to the wishes of the parents and their conflicting custody requests; it considered evidence of the children's relationship with both parents and that the children enjoyed a particularly strong emotional tie to their mother who had been their primary caregiver; it considered Julie's support system in North Carolina and the proximity of extended family; and it considered Julie's consistent financial support of the children in contrast to Ron's, under §§ 40-4-212(1)(i), (k), MCA (2005). The court pointed to substantial evidence supporting its conclusion that remaining in the primary custody of

8

their mother, whether she stayed in Bozeman or moved to North Carolina, was in the children's best interests.

¶26   This Court previously has considered the question of whether a court should allow a parent to move to another state with the children for professional or other opportunities. We have set forth factors to be balanced:

> The custodial parent who bears the burdens and responsibilities of raising the child is entitled, to the greatest possible extent, to the same freedom to seek a better life for herself or himself and the children as enjoyed by the noncustodial parent.
>
> .   .   .
>
> [T]he custodial parent's freedom is qualified by the special obligations of custody, the state's interest in protecting the best interests of the child and the competing interests of the noncustodial parent.
>
> .   .   .
>
> As a fundamental right, the right to travel interstate can only be restricted in support of a compelling state interest. . . .  [A]ny interference with this fundamental right must be made cautiously, and may only be made in furtherance of the best interests of the child.  To that end, we require the parent requesting the travel restriction to provide sufficient proof that a restriction is, in fact, in the best interests of the child.

*Cole*, 224 Mont. at 213, 729 P.2d at 1280-81.

¶27   In *Cole*, a father sought a travel restriction to prevent the mother from moving to Florida with their two children, arguing, in part, that the best interests of the children are only achieved when the parenting time is equal.  We affirmed the District Court's denial of the restriction, pointing to its consideration of the circumstances.  The court considered the professional parenting evaluation and found that the mother played an extensive role in fostering both children's development, particularly their special needs child.  Long amounts

of time away from their mother or each other would have been harmful to these children, and the child with special needs required consistent care and an uninterrupted school year according to experts. The court further determined that Florida had more career opportunities for the mother and more services for their special needs child. The father did not provide sufficient proof that a travel restriction was in the children's best interests.[1]

¶28 In *Matter of Custody of D.M.G.*, 1998 MT 1, 287 Mont. 120, 951 P.2d 1377, the father of twin sons challenged the mother's move with the children from Helena to Salem, Oregon. After separating from the father, the mother became the primary residential custodian while the father continued to be actively involved in the children's care. She received AFDC assistance, worked in a grocery store part time, and completed a clerical training course. He worked for a title company. She found a salaried job with benefits and a home she could afford in Salem, Oregon, near her immediate family. The father eventually challenged her relocation in court. The District Court required the mother to return to Helena, and if she chose not to, the father would become the primary residential custodian. We reversed, noting that both parents are fit and concerned, both have budding careers and an ability to make a home for the children, and both have extended family and support in each community. We concluded that the father failed to prove that the children's best

---

[1] Montana law no longer provides a presumption in favor of giving custody to the parent who provided most of the primary care during the child's life nor does it still require that the allotment of time between the parties be as equal as possible, as was the case at the time *Cole* was decided. *In re Marriage of Robison*, 2002 MT 207, ¶ 21, 311 Mont. 246, ¶ 21, 53 P.3d 1279, ¶ 21; § 40-4-224(2), MCA (repealed 1997). However, the *Cole* court primarily looked to the evidence presented, such as the parenting evaluations, to determine the children's best interests, and that is still the method today.

interests would be most appropriately served by effectively requiring the mother and the children to relocate back to Helena from Salem where she had created a new home and career for herself.

¶29   In *Robison*, a Butte couple with three children divorced and the mother moved to Idaho to remarry. She attempted to take the children with her but the court ultimately found the best interests of the children were served by staying in Butte with their father who had a well-established support system including grandparents who were close with the children, neighbors, friends with children of similar ages, daycare providers, and teachers. The mother, by contrast, had no support system and no career advancement in Idaho. On appeal, we affirmed, noting that the mother was not moving in order to build a career, as was the case in *Cole* and *D.M.G.*, nor was she moving to an area she was familiar with or where she had family or friends, as was the case in *D.M.G.* We also noted in *Robison* that the parent resisting the move need not show that the move would be disadvantageous for the child or that the child would be harmed by the move, but merely that a move is not in the child's best interests. *Robison*, ¶ 27.

¶30   Applying our rationale in *Cole*, *D.M.G.*, and *Robison* to the case *sub judice*, we conclude that Ron failed in his burden to provide legally sufficient proof that the children's best interests would be most appropriately served by effectively requiring Julie to stay in Montana or, if she chose not to, transferring primary physical custody to Ron. *See D.M.G.*, ¶ 23.

¶31    The District Court considered but rejected Ron's argument that Julie had not sought equivalent employment opportunities in Montana, finding that she had done reasonable research into Montana careers. The District Court noted that Julie's new position in North Carolina would require less travel than equivalent positions in Montana, and not having to travel as much for work would allow Julie more time with her children.

> 26.   . . . Additionally, Julie's work in North Carolina would not require her to travel significantly, so she would be more available to the children and would be better able to care for them. Any comparable employment in the Bozeman area would almost certainly require her to travel a great deal.

¶32    The court also considered and dismissed Ron's assertion that the rural area in North Carolina where Julie proposed to move presented fewer opportunities than Bozeman for the children or him. Substantial evidence was presented showing that Bryson City, North Carolina, has good schools, good year-round recreation, a developing vacation-destination economy to support Ron's career, and the cities of Asheville, North Carolina, and Atlanta, Georgia, within a short drive.

> 32.   The area . . . is well-suited for raising children. The region enjoys good schools and recreational activities. Excellent healthcare facilities, particularly appropriate for [T.D.'s] heart condition, are within a few hours' driving distance.

> 33.   . . . The Court believes that enough employment and recreational opportunities exist in North Carolina for Ron to do well there.

¶33    The court also considered that Ron's family is on the east coast and, therefore, much closer to the children than if the children stayed in Montana. The District Court noted Julie's support system of friends was far better in North Carolina than in Montana. Considering

12

many of the relevant statutory factors, the District Court ultimately concluded, based on substantial evidence, that it was in the children's best interests to move with Julie to North Carolina where she has a better job, a good support system, and a good community. The District Court did not abuse its discretion in doing so.

¶34 *Issue 2: Did the District Court err by not including the post-separation appreciation in Julie's retirement account in its calculation of the marital estate's value?*

¶35 The disposition of a marital estate, including retirement accounts, is governed by § 40-4-202, MCA, which provides:

> In a proceeding for dissolution of a marriage . . . the court . . . shall . . . equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or wife or both. . . . In dividing property acquired prior to marriage; property acquired by gift, bequest, devise, or descent; the increased value of property acquired prior to marriage; . . . the court shall consider those contributions of the other spouse to the marriage, including:
> (a) the nonmonetary contribution of a homemaker;
> (b) the extent to which such contributions have facilitated the maintenance of this property; and
> (c) whether or not the property division serves as an alternative to maintenance arrangements.

¶36 As a general rule, the value of the marital estate should be determined at or near the time of dissolution; however, the unique circumstances of marital relationships can modify this generally accepted date for the valuation of assets. *In re Marriage of Hochhalter*, 2001 MT 268, ¶ 17, 307 Mont. 261, ¶ 17, 37 P.3d 665, ¶ 17. Where a husband and wife live separately, financially and otherwise, ending their marital relationship for all practical purposes, the relevant time for valuation of the marital estate may be the date of their separation rather than the date of their dissolution. *Hochhalter*, ¶ 18.

13

¶37    Substantial evidence supports the District Court's determination that the parties'

marital relationship ended sometime between April and July, 2004, when they began

managing their finances separately and eventually lived separately. The court exercised its

discretion and determined that the date of the parties' financial separation marked the end of

their marital relationship for purposes of distributing the marital estate.

¶38    The District Court found as a matter of fact:

> 12.   . . .   At the time of the parties' separation, Julie's retirement
> account was valued at $62,191. It is unclear how much Julie contributed to
> her account after the parties separated, but the account currently exceeds
> $90,000. Some portion of that increase is due to market appreciation on the
> marital portion of the account, but the amount is unknown. Therefore, the
> Court finds the marital portion of the account to be $62,191.

¶39    Ron claims that Julie's retirement account had a value of $87,953.66 at the time of

their separation and $99,446 at the time of their divorce, and that he is entitled to half of the

difference between those two figures. A review of the transcript and exhibits shows that the

value of the retirement account was $62,191 when the couple separated between April and

July 2004. A reasonable interpretation of the evidence is that $87,953.66 was the value of

her retirement account in June 2005, a year after Ron and Julie separated.

¶40    Substantial evidence supports the court's determination that the balance of Julie's

retirement account at the time of their separation was $62,191. Thus, the District Court did

not err in ordering that Ron is not entitled to any increase in the value of Julie's retirement

account after that time. *See Haberkern*, ¶ 24.

¶41    *Issue 3: Did the District Court err in ordering that Julie pay Ron the entire amount owed to equitably distribute the marital estate in cash without considering the tax implications of an early withdrawal from Julie's retirement account?*

¶42    The district court has wide discretion in ordering the equitable distribution of the marital estate and we generally defer to the court's assessment. However, where a property distribution ordered by the court includes a taxable event precipitating a concrete and immediate tax liability, the district court is obligated to consider the tax liability before entering its decree. *In re Marriage of Beck*, 193 Mont. 166, 171, 631 P.2d 282, 285 (1981).

¶43    As noted above at ¶ 18, the District Court ordered Julie to pay Ron $51,990 on or before February 28, 2007. In fixing this amount the court determined that the marital portion of both party's retirement accounts would be combined, and the combined amount equally divided. This calculation resulted in an order that Julie pay to Ron $31,595 in order to equalize the distribution of the retirement accounts. The court then included this amount with the division of the remainder of the party's assets, and the net result was that Julie owed Ron $63,415. From the $63,415, the court offset the $11,425 it determined that Ron owed Julie as back child support, which resulted in the required payment of $51,990.

¶44    On cross-appeal Julie asserts that the District Court ordered her to pay the $51,990 without considering the adverse tax consequences triggered by an early withdrawal from her retirement account to pay Ron as ordered. She argues that she should be allowed to satisfy the retirement asset portion of her obligation to Ron with a distribution from her retirement assets. Ron disagrees.

15

¶45 We note that the decree does not require that $31,595 be withdrawn from Julie's retirement account. Still, there is no doubt that the District Court's decree required a distribution to Ron of this amount as a part of the parties' retirement assets. A withdrawal by Julie from her retirement account would trigger a ten percent early withdrawal penalty under 26 U.S.C. § 72(m)(5), and income tax liability under 26 U.S.C. § 408(d)(1). The tax code allows for divorcing couples to avoid these tax liabilities by transferring a distribution of a lump sum to the ex-spouse. 26 U.S.C. § 408(d)(6). Internal Revenue Code § 408(d)(6) provides that distributions under a divorce instrument, such as a Qualified Domestic Relations Order (QDRO) (*see* 26 U.S.C. § 71(b)(2)(A)), are not considered a taxable transfer. If this amount were distributed to Ron from Julie's retirement account by use of a QDRO, she would not suffer adverse tax consequences.

¶46 Even in his proposed findings of facts and conclusions of law filed after the trial, Ron requested a distribution of retirement assets by entry of a QDRO:

> The net amount necessary to balance the division shall be paid to Ron *by distribution* from Julie's retirement account in the amount of $56,223. The parties shall prepare an appropriate QDRO for presentation to the Court within 30 days from entry of this Decree. [Emphasis added.]

¶47 A district court must consider the tax implications of its decree if such consequences are concrete and immediate. *Haberkern*, ¶ 17. The adverse tax consequences to Julie of the ordered distribution of retirement assets are concrete and seem to be immediate. Yet, the findings of fact and conclusions of law entered by the District Court give no indication whether the court considered the tax consequences of this distribution. We remand to the

16

District Court for further consideration of the tax implications, and the manner and timing of the distribution of the retirement account portion of the marital estate.

¶48    *Issue 4: Did the District Court err in ordering that Julie pay Ron interest on her obligation to Ron before the date it was due?*

¶49    The District Court ordered that Julie pay to Ron the $51,990 required to accomplish an equitable distribution of the marital estate no later than February 28, 2007, and also ordered that such amount would bear interest at the rate of ten percent per year from the date of the decree until it is paid in full.  A district court has the discretion to require that interest be paid on an amount owed pursuant to a decree of distribution of a marital estate.  Section 25-9-204, MCA (2005); *In re Marriage of Hedges*, 2002 MT 204, ¶ 24, 311 Mont. 230, ¶ 24, 53 P.3d 1273, ¶ 24.  Considering the length of time the process has taken in this case, the amount of the payment, the parties' assets, and Julie's ability to make payment, the District Court's order that Julie pay interest was not an abuse of discretion.  However, on remand for further consideration of the parties' retirement accounts, the District Court is free to re-visit its order concerning payment of interest if such is necessary to effect an equitable distribution.

## CONCLUSION

¶50    For the foregoing reasons, we remand to the District Court for further consideration of the distribution of the parties' retirement accounts in conformity with this Opinion, and affirm the remainder of the decree.

/S/ JOHN WARNER

17

We Concur:


/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER