

DA 10-0205

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 248

MICHELLE KULSTAD,

> Plaintiff and Appellee,

v.

BARBARA L. MANIACI,

> Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DR 07-34
Honorable Edward P. McLean, Presiding Judge

COUNSEL OF RECORD:

> For Appellant:
>
> > Linda Osorio St. Peter, St. Peter Law Offices, P.C.; Missoula, Montana
> > Austin Nimocks, Alliance Defense Fund; Scottsdale, Arizona
>
> For Appellee:
>
> > Michael G. Alterowitz, Alterowitz Law Offices, P.C.; Missoula, Montana
> > Elizabeth L. Griffing, ACLU of Montana Foundation; Missoula, Montana
> > Susan G. Ridgeway, Attorney at Law; Missoula, Montana

> > > Submitted on Briefs:  September 15, 2010

> > > Decided:  November 30, 2010

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Barbara Maniaci appeals from the order of the District Court adopting a Final Parenting Plan, which granted sole custody of L.M. and A.M., minor children, to Appellee Michelle Kulstad. She also challenges the imposition of a protective order restricting the parties' access to the children's therapy notes and products. We affirm the Final Parenting Plan and vacate the District Court's determination that § 40-4-225, MCA, is unconstitutional.

¶2 We restate the issues on appeal as follows:

¶3 *1. Did the District Court err by adopting a Final Parenting Plan granting residential custody of the children to Kulstad?*

¶4 *2. Did the District Court rely on evidence from the Child and Family Services Division (CFSD), and deny Maniaci a meaningful opportunity to confront and cross-examine expert testimony, in violation of Maniaci's due process rights?*

¶5 *3. Did the District Court err by denying Maniaci access to the children's therapy records based on the constitutional right of privacy?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 **Parenting Plan**

¶7 This custody matter has been before the Court on several prior occasions. The decision in *Kulstad v. Maniaci*, 2009 MT 326, 352 Mont. 513, 220 P.3d 595 (*Kulstad I*), discusses in detail the parties' relationship to each other and to the children. Here, we summarize those facts and provide additional facts necessary for this appeal.

2

¶8     Maniaci and Kulstad met in late 1995 and were domestic partners from 1996 until 2007.  Maniaci and Kulstad brought L.M. into their household in 2001 and A.M. from Guatemala in 2004.  As same-sex partners, the parties were advised that only one of them would be legally eligible to adopt the children.  They agreed that Maniaci would be the adoptive parent, though both of them would function as co-parents.

¶9     Kulstad filed a petition in January 2007 to dissolve the parties' relationship and to obtain a parental interest in the children, which was resisted by Maniaci.  After a hearing, the District Court issued a pre-trial ruling which concluded that Kulstad had established a parent-child relationship with the children and adopted an interim parenting plan designating Maniaci as the residential custodial parent and granting Kulstad visitation with the children.  The court also entered other orders in preparation for trial.  Cindy Miller, Ph.D. (Dr. Miller), was appointed to conduct a parenting plan evaluation.  Dr. Miller was also authorized by the court to appoint a guardian ad litem (GAL) and a therapist for the children.  Jo Antonioli, attorney, was subsequently appointed as GAL, and Paul Silverman, Ph.D. (Dr. Silverman), was designated as the children's therapist.  According to Dr. Silverman and Dr. Miller, the children suffer from significant attachment disorders and have difficulty regulating themselves emotionally.  The Court also ordered the parties to participate in the Positive Alternatives for Children Team (PACT) Program, which is a group of community professionals who work in difficult custody cases to reduce the adversarial impact of the proceeding on children and improve

use of financial resources. The PACT Program consisted of Dr. Miller, Dr. Silverman, and Antonioli.

¶10 After a bench trial in May 2008, the District Court awarded Kulstad a parental interest in the children. The court also issued an interim parenting schedule and directed the GAL to submit formal recommendations for a final parenting schedule after one year, at which time the court indicated it would issue a ruling on a Final Parenting Plan. Maniaci appealed and, in October 2009, this Court affirmed the District Court in *Kulstad I.*

¶11 On or around November 27, 2009, Maniaci traveled to Tennessee on apparent family matters, telling the children she would return on December 21, 2009. Maniaci was then the primary custodian, and the parties agreed that Kulstad would take care of the children for the three weeks Maniaci would be in Tennessee. On December 7, 2009, Maniaci's attorney wrote to Antonioli, informing her that Maniaci was relocating to Tennessee. As of March 2010, Maniaci had neither returned to Montana nor seen L.M. or A.M. since November of 2009. The resulting de facto parenting arrangement has been that the children have resided full-time with Kulstad**.**

¶12 Antonioli, as GAL, requested that the parties submit their parenting plan proposals to her by the end of November 2009. Maniaci submitted an initial proposal on November 30, 2009, and then submitted a revised proposal in December reflecting her move to Tennessee. Maniaci proposed that the children reside with her in Tennessee, with Kulstad having visitation with the children during the summer and on various

4

holidays. In response to questions from Antonioli, Maniaci filed a second revised proposal which clarified Kulstad's parenting time in the summer and allowed for Kulstad to have additional visitation with the children. Kulstad proposed that the children reside with her during the school year, with Maniaci parenting the children in Montana for one-half of the summer and Christmas break, along with certain school vacations. Kulstad's proposal also allowed Maniaci to visit the children in Montana for up to one week per month.

¶13 The PACT Program submitted a final report in January 2010 recommending that Kulstad have residential custody of the children and Maniaci having parenting time which would be exercised in Montana. If Maniaci moved back to Montana, the schedule could be modified to a 50/50 shared parenting arrangement if found to be in the best interests of the children. If Maniaci remained in Tennessee, consideration could be given, after two years, to the children traveling to Tennessee for Maniaci's parenting time if "circumstances have changed such that [Maniaci] is no longer attempting to indoctrinate the children" and was in the children's best interests. The GAL's recommended Final Parenting Plan advised that Kulstad have residential custody of the children and that Maniaci have parenting time in Montana up to one week each month and time over spring break and Christmas.

¶14 The District Court conducted a hearing on the Final Parenting Plan. Maniaci did not appear or testify. Testimony was received from Kulstad, Antonioli, Dr. Miller, Dr. Silverman, Maniaci's therapist Jennifer Walrod, CFSD supervisor Nicole Grossberg,

CFSD social worker Cherrill Rolfe, among others. On April 1, 2010, the District Court entered its Findings of Fact and Conclusions of Law and Order on the Final Parenting Plan which granted Kulstad sole custody of the children, with supervised visitation for Maniaci in Montana, until such time as Maniaci complies with the PACT report.

¶15 **Protective Order**

¶16 Following the District Court's award of parenting rights to Kulstad in September 2008, Antonioli sought a Temporary Protective Order (TPO) seeking to restrict the parties' access to the therapy notes and products, including video recordings, of the children's therapist, Dr. Silverman. Antonioli's request was precipitated by concerns expressed by Dr. Silverman and Dr. Miller that the therapy notes were being utilized to further the adversarial goals of the attorneys and provision of them was contrary to the children's best interest. Although Maniaci had not been given an opportunity to respond to Antonioli's motion, the District Court granted the TPO.

¶17 In March 2009, Maniaci filed a Petition for a Writ of Supervisory Control with this Court requesting that the TPO be vacated. We ordered briefing on whether a child's therapist can withhold therapy notes or videos from a parent based on the therapist's concern for the best interest of the child and the counseling relationship. We thereafter granted Maniaci's petition in part and remanded the matter, directing the District Court to provide Maniaci an opportunity to address Antonioli's motion for a TPO. The District Court conducted a hearing in which Dr. Silverman, Dr. Miller, Dr. Bach, and Maniaci testified. On September 29, 2009, the District Court ordered that the protective order

6

would remain in place. Reasoning that L.M. and A.M.'s privacy rights superseded the parties' requests for the records, the court concluded that § 40-4-225, MCA, was unconstitutional.

¶18 Maniaci appeals from these orders.

## ISSUES NOT PRESERVED FOR APPEAL

¶19 Maniaci argues, pursuant to *In re Marriage of Guffin*, 2009 MT 169, 350 Mont. 489, 209 P.3d 225, that the Final Parenting Plan violated her constitutional right to travel. Kulstad responds that this issue was waived—that no evidence or arguments were presented in District Court to support Maniaci's constitutional right to travel claim. Maniaci replies that she preserved this constitutional issue because it was "a focal point of the trial" and "inherently incorporated" into the District Court parenting guidelines.

¶20 Generally, "[a] constitutional issue is waived" if not presented to the district court. *In re Custody of Arneson-Nelson*, 2001 MT 242, ¶ 37, 307 Mont. 60, 36 P.3d 874. The rationale behind this rule is to promote judicial economy and to " 'bring[] alleged errors to the attention of each court involved, so that actual error can be prevented or corrected at the first opportunity.' " *State v. West*, 2008 MT 338, ¶ 17, 346 Mont. 244, 194 P.3d 683 (quoting *City of Missoula v. Asbury*, 265 Mont. 14, 20, 873 P.2d 936, 939 (1994)). An issue presented for the first time to this Court is generally deemed " 'untimely.' " *Day v. Payne*, 280 Mont. 273, 276, 929 P.2d 864, 866 (1996) (quoting *Akhtar v. Van de Wetering*, 197 Mont. 205, 209, 642 P.2d 149, 152 (1982)).

7

¶21 Our review of the record reveals no indication that Maniaci raised or argued her constitutional right to travel before the District Court, giving it an opportunity to consider the issue. The issue was first raised in Maniaci's briefing before this Court. We thus decline to address it. *See In re Custody of N.G.H.*, 1998 MT 212, ¶ 19, 290 Mont. 426, 963 P.2d 1275.

¶22 Secondly, Maniaci raises an additional due process claim in her reply brief--arguing that the pleadings were insufficient to notify her that she "stood to lose both her right to joint or shared custody and her right of continuing visitation," and citing *Steab v. Luna*, 2010 MT 125, 356 Mont. 372 , 233 P.3d 351. A party may not raise a new issue for appellate review for the first time in its reply brief. *See e.g. State v. Hagen*, 283 Mont. 156, 159, 939 P.2d 994, 996 (1997); M. R. App. P. 12(3). Therefore, Maniaci's argument that the District Court, in awarding Kulstad sole custody, exceeded the relief sought by the pleadings has not been properly raised, and we decline to address it.

## STANDARD OF REVIEW

¶23 We review a district court's findings in child custody matters to determine whether they are clearly erroneous. *In re Custody of D.M.G.*, 1998 MT 1, ¶ 10, 287 Mont. 120, 951 P.2d 1377. "A court's findings are clearly erroneous if they are not supported by substantial evidence, the court misapprehends the effect of the evidence, or our review of the record convinces us that a mistake has been committed." *In re Marriage of Shupe*, 276 Mont. 409, 416, 916 P.2d 744, 748 (1996) (citation omitted). Because the district court is in a superior position to consider the evidence, this Court will not overturn a

district court's decision in child custody matters unless clear abuse of discretion is shown. *In re Marriage of Czapranski*, 2003 MT 14, ¶ 10, 314 Mont. 55, 63 P.3d 499 (citations omitted). "The test for an abuse of discretion is whether the district court acted arbitrarily without the employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *In re Marriage of Robison*, 2002 MT 207, ¶ 15, 311 Mont. 246, 53 P.3d 1279 (citing *In re Marriage of Meeks*, 276 Mont. 237, 242, 915 P.2d 831, 834 (1996)).

¶24 We review a district court's conclusions of law for correctness. *In re Marriage of Thorner*, 2008 MT 270, ¶ 21, 345 Mont. 194, 190 P.3d 1063. This Court's review of constitutional questions is plenary. *In re Custody of Krause*, 2001 MT 37, ¶ 16, 304 Mont. 202, 19 P.3d 811 (citations omitted).

## DISCUSSION

¶25 ***1. Did the District Court err by adopting a Final Parenting Plan granting residential custody of the children to Kulstad?***

¶26 ***2. Did the District Court rely on evidence from the Child and Family Services Division (CFSD), and deny Maniaci a meaningful opportunity to confront and cross-examine expert testimony, in violation of Maniaci's due process rights?***

¶27 We address the first two issues together. Maniaci argues that the "Final Parenting Plan was based on unreliable evidence and testimony obtained through the violation of [her] constitutional rights" and asks that the District Court's decision to remove her as the children's primary custodian be reversed. Maniaci contests certain CFSD evidence,

9

alleging that its use violated her due process rights, and she also contests a post-hearing letter sent to the court by Dr. Silverman, arguing she was denied a meaningful opportunity to confront and cross-examine him about the letter. Kulstad responds that the parenting plan approved by the District Court is in the best interests of the children and that Maniaci's due process rights were not violated because Maniaci chose not to be heard by neither responding to the CFSD evidence nor attending the hearing.

¶28 Considering first whether the Final Parenting Plan approved by the District Court was supported by substantial evidence, a court is obligated to determine child custody matters based upon the children's best interest and the application of statutory factors. Section 40-4-212(1), MCA; *Czapranski*, ¶ 11. These factors include, but are not limited to, "the parents' wishes; the child's wishes; the child's interaction with the parents and others; the child's adjustment to home, school, and the community; the mental and physical health of all individuals involved; physical abuse or threatened physical abuse; and chemical dependency." *In re Marriage of Anderson*, 260 Mont. 246, 252, 859 P.2d 451, 455 (1993); § 40-4-212(1), MCA. Although it must consider the statutory factors, a court need not make specific findings as to every factor. *In re Marriage of Carter*, 2003 MT 19, ¶ 14, 314 Mont. 84, 63 P.3d 1124 (citations omitted).

¶29 Section 40-4-233, MCA, provides the purpose and objectives of a final parenting plan which, in pertinent part, are to:

(1) protect the best interest of the child, consistent with 40-4-212;
(2) provide for the physical care of the child;
(3) maintain the child's emotional stability and minimize the child's exposure to parental conflict;

10

(4) provide for the child's changing needs as the child grows and matures, in a way that minimizes the need for future amendment to the final parenting plan . . . .

¶30 In determining custody, the district court is " 'bound to give primary consideration to the physical, mental, and emotional conditions and needs of the children.' " *In re M.W.*, 2002 MT 126, ¶ 17, 310 Mont. 103, 49 P.3d 31 (quoting *Matter of C.M.*, 281 Mont. 183, 187, 932 P.2d 1063, 1066 (1997). "[A] district court's custody determination is a discretionary decision, and this Court will not disturb the decision when it is supported by substantial evidence." *Czapranski*, ¶ 48 (citations omitted).

¶31 The District Court referenced the findings entered in its order of September 29, 2008, which had determined that the children have strong attachment to Kulstad and Maniaci, but that "[s]ignificant strains [had] already been placed on the children's relationship" with Kulstad. The court also referenced its 2008 findings that Maniaci's indoctrination of the children against Kulstad was not in the children's best interest, and that it would be in the children's best interest to significantly reduce Maniaci's parenting time if such indoctrination continued. In its 2010 Findings of Fact, the court found that Maniaci has continued to "indoctrinate the children against [Kulstad], and has also coached them to make untrue statements about [Kulstad]." The court also found that Maniaci appeared to be unable to stop indoctrinating the children or to stop coaching them to make false statements about Kulstad. The court referenced the testimony of Dr. Miller and Dr. Silverman that such behaviors are harmful to the children. The record

shows that when asked if "that kind of indoctrination is harmful to the children," Dr. Miller responded, "[a]bsolutely, yes."

¶32 The court found that in November of 2009, Kulstad received physical custody of the children for an agreed three-week period while Maniaci traveled to Tennessee; that Maniaci told L.M. and A.M. she would return to Montana on December 21; that on December 7 Maniaci notified Antonioli that her move to Tennessee was permanent; that Antonioli attempted to set up a meeting with the parties, counsel, and Dr. Miller but Maniaci was not available; and that Maniaci had not seen the children since she departed for Tennessee.

¶33 The District Court determined that Dr. Miller's, Dr. Silverman's and Rolfe's testimony was professional, unbiased and well-researched. However, the court determined the testimony of Maniaci's witnesses was limited by the sources of their information—either Maniaci or the children as coached by Maniaci—and thus lacked credibility.

¶34 Dr. Miller testified about the PACT report and its incorporation of the statutory factors for determining the best interests of the children. Regarding the children's interaction with parents, Dr. Miller testified that Kulstad has taken "an appropriate, full-time parental role," but that Maniaci has interacted with the children in a way that "the children may feel that the most effective way of engaging [Maniaci] is to report negative things about Ms. Kulstad to her." Regarding the children's adjustment, Dr. Miller testified that both L.M. and A.M. have significant attachment issues and

12

difficulty self-regulating. She noted how upsetting it can be for children with attachment disorders to experience a sudden and lengthy absence of a parent. Specifically, Maniaci's decision to stay in Tennessee, after telling the children she would be returning to Montana, has "likely compromised the security of the children's attachment to her," and could be interpreted by the children as "a broken promise." Also, Dr. Silverman testified that since Maniaci left Montana, L.M. had informed him that "he had a new mommy," and that A.M. was distraught and expressed sadness, anger, and confusion.

¶35 Regarding the parties' mental health, Dr. Miller testified that Maniaci has more mental health issues, which could negatively affect her parenting, than Kulstad. She testified about a PACT report's conclusion that, "given [Maniaci]'s extraordinary history of doing everything within her power to obstruct Ms. Kulstad's contact with the children, the children traveling with [Maniaci] to Tennessee poses the very grave danger of Ms. Kulstad never being able to see the children, again . . . ." Dr. Silverman likewise testified that his major concern, if the children were allowed to travel to Tennessee, was that "they [would] not be allowed to return."

¶36 In its Conclusions of Law, the District Court determined that Maniaci's decision to leave the children with Kulstad while she traveled to Tennessee "completely undermine[d] her stated concerns" about Kulstad's parenting ability and caused the court to conclude that reports against Kulstad to CFSD were not true. The court approved the Final Report of the PACT Program and the GAL's recommended Final Parenting Plan.

13

¶37 Upon review, we conclude that the District Court's findings are supported by substantial evidence and are not clearly erroneous. The court's Findings of Fact and Conclusions of Law set forth the essential and determinative factors upon which the District Court based its Final Parenting Plan determination. While the District Court did not specifically cite § 40-4-212(1), MCA, it clearly contemplated the factors. *See In re Marriage of Fishbaugh*, 2002 MT 175, ¶ 23, 310 Mont. 519, 52 P.3d 395. The PACT report contained an analysis of the factors, and the court specifically considered the children's emotional and mental health, the children's relationship to both parties, the mental health of both parties, Maniaci's role in the unsubstantiated abuse allegations, Maniaci's decision to leave the children in Kulstad's care even in light of prior abuse allegations against Kulstad, Maniaci's sudden move to Tennessee, the emotional toll of that departure on the children, and the risks of allowing the children to travel to Tennessee. The District Court did not abuse its discretion in adopting the Final Parenting Plan.

¶38 Under the second issue, Maniaci contends that the GAL's recommendation and PACT final report, approved by the District Court in its decision on the Final Parenting Plan, used a CFSD "determination" of psychological abuse in violation of her due process rights. According to Maniaci, CFSD made a "conclusion" that she psychologically abused the children without following proper statutory or regulatory protocol, and then reduced that "determination" into a letter which was subsequently relied on by the GAL, PACT, and the District Court. Kulstad argues Maniaci's due

process claim is without merit but that, in any event, the District Court had many bases apart from the CFSD concern on which to formulate its custody determination.

¶39 The District Court found that, since July of 2008, Maniaci or persons acting on her behalf had made numerous unsubstantiated reports of child abuse against Kulstad. In November 2009, CFSD supervisor Grossberg contacted Maniaci and sought to schedule a meeting with the parties, counsel, the GAL, Dr. Silverman, CFSD social worker Rolfe, and herself in December to discuss the allegations and their negative effects on the children. However, the meeting did not occur because Maniaci did not return from Tennessee or contact CFSD to schedule the meeting. On January 11, 2010, Rolfe and Grossberg wrote a letter to the GAL stating "[b]ecause of these latest [unsubstantiated] reports called to the Department concerning [Kulstad's] care of the children, the CFSD has more concern that these children are exposed to psychological abuse by Barbara Maniaci." Maniaci contends that this "determination of psychological abuse" was erroneously used by the GAL and PACT Program, which was then relied upon by the court. Maniaci filed a post-hearing motion to strike portions of Dr. Miller's, Dr. Silverman's, and Antonioli's testimony which had relied on CFSD's "conclusion" of psychological abuse, which the District Court denied.

¶40 First, it must be noted that the testimony of Grossberg, Rolfe, the GAL, the CFSD letter itself, and the subsequent findings by the court all allude to a *concern of psychological abuse.* This concern is neither an actual report of psychological abuse under § 41-3-201, MCA, nor an investigation or a determination of abuse under § 41-3-

202, MCA. Antonioli testified: "I don't believe I have ever said that [Maniaci] is abusing the children. I believe that there has been a concern about psychological abuse." In its Conclusions of Law, the court stated "[t]he Court shares the concern that such reporting may be psychologically abusive to the children." As opposed to Maniaci's argument that CFSD "reached a decision that Maniaci was psychologically abusing her children," the concerns simply had not risen to the level of an actual report or finding of psychological abuse levied against Maniaci.

¶41    "The fundamental requirements for due process are 'notice and opportunity for hearing appropriate to the nature of the case.' " *In Matter of Adoption of K.L.J.K.*, 224 Mont. 418, 421, 730 P.2d 1135, 1137 (1986) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S. Ct. 652 (1950)). Here, Maniaci was notified of the concerns about psychological abuse. Noting Walrod testified that Maniaci should have had a chance to respond to the concerns, the court found that "[t]his matter has been going on for a few years now, and Barbara Maniaci has had plenty of opportunities and time to respond." Evidence and testimony indicated that Maniaci was asked to attend a meeting with CFSD about the issue, but she failed to do so. She also did not appear or testify at the parenting plan hearing, although her counsel elicited testimony and vigorously examined witnesses about the concerns of psychological abuse. Therefore, Maniaci had ample notice and opportunity to respond.

¶42    Maniaci also argues that she was denied a meaningful opportunity to confront and cross-examine Dr. Silverman about a post-hearing letter he sent to the court.

16

Dr. Silverman testified regarding his concerns about the children traveling to Tennessee, stating:

> My major concern is that [the children] will not be allowed to return [to Montana].
> I base that on a consultation I had with [Maniaci and her husband[1]] in September, before they left.
> During that consultation, they told me that they believe [Kulstad] might murder the children, and that they would hold me responsible for anything bad that happened.
> If I was a parent, saying that about someone else, I'd want that person to have absolutely no contact with my children.

Two days after his testimony, Dr. Silverman sent a letter to the District Court judge stating that his testimony at the hearing did not exactly match with his therapeutic notes, which he described as follows:

> [Maniaci and her husband] report that [Kulstad] stole [Maniaci]'s pistol at separation. [Maniaci and her husband] afraid for [A.M.]'s life. . . Both will hold Therapist responsible if something happens to children.

On March 16, 2010, Maniaci filed a motion to strike Dr. Silverman's testimony because of the letter. The District Court denied the motion. Maniaci argues her cross-examination at the hearing would have been different in light of the differing facts stated in the letter and, as a result, her due process rights were violated.

¶43 Though evidence cannot be submitted in this fashion, we note there was little factual difference between Dr. Silverman's testimony and his subsequent letter. "[N]o civil case shall be reversed by reason of error which would have no significant impact upon the result; if there is no showing of substantial injustice, the error is harmless."

---

[1] Maniaci married Larry Groth in January 2008.

17

*Newbauer v. Hinebauch*, 1998 MT 115, ¶ 20, 288 Mont. 482, 958 P.2d 705 (citing *Rafanelli v. Dale*, 278 Mont. 28, 48, 924 P.2d 242, 254-55 (1996). A case cannot be reversed based on an error in the admission of evidence, where such evidence was not of the type to have affected the outcome. *Newbauer*, ¶ 20 (citations omitted). In view of the substantial record in this matter, we conclude that the error did not affect the outcome and was harmless.

¶44 Further, even if Dr. Silverman's letter and the aforementioned CFSD concerns of psychological abuse were stricken from the record, there remains overwhelming evidence in support of the District Court's custody determination, which we have outlined above. The objections raised by Maniaci simply do not undermine the extensive support in the record for the District Court's order.

¶45 ***3. Did the District Court err by denying Maniaci access to the children's therapy records based on the constitutional right of privacy?***

¶46 Maniaci challenges the District Court's determination that § 40-4-225, MCA, which provides that a child's records may not be denied to parents who are parties to a parenting plan, is unconstitutional because it infringes on A.M.'s and L.M.'s right to privacy.

¶47 As explained above, the District Court continued a protective order prohibiting the parties from receiving Dr. Silverman's therapy records of his sessions with the children on the basis of its determination that § 40-4-225, MCA, was unconstitutional. The court analyzed "whether a child's privacy rights can supersede parental authority" and

18

concluded that § 40-4-225, MCA, "must yield to the more restrictive constitutional rights of the children."

¶48 Maniaci argues the District Court erroneously relied on foreign authority, that any patient-therapist privilege between Dr. Silverman and the children was waived because notes had previously been provided to the parties, that she is allowed absolute access to the therapy notes due to the clear language of § 40-4-225, MCA, that HIPAA[2] specifically provides that state law can preempt HIPAA's general rule prohibiting access to psychotherapy notes, and that parents' rights prevail over third party interests absent a showing of unfitness.

¶49 "Courts should avoid constitutional questions whenever possible." *Wolfe v. State, Dept. of Labor & Ind.*, 255 Mont. 336, 339, 843 P.2d 338, 340 (1992) (citing *Ingraham v. Champion Int'l*, 243 Mont. 42, 46, 793 P.2d 769, 771 (1990)); *State v. Still*, 273 Mont. 261, 263, 902 P.2d 546, 548 (1995). A court should not decide the constitutionality of a statute if the case can be decided without reaching the constitutional question. *Baxter v. State*, 2009 MT 449, ¶ 10, 354 Mont. 234, 224 P.3d 121; *Wolfe*, 255 Mont. at 339, 843 P.2d at 340 (citing *Taylor v. Dept. of Fish, Wildlife & Parks*, 205 Mont. 85, 90, 666 P.2d 1228, 1231 (1983)).

¶50 We have determined that we can decide the merits of this appeal without ruling on the constitutionality of § 40-4-225, MCA. We have already emphasized that the record contains overwhelming evidence in support of the District Court's order on the Final

---

[2] Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996).

19

Parenting Plan. Access by either party—Kulstad was denied access as well—to Dr. Silverman's therapy notes for the months in question could not have conceivably affected the outcome of this case. Because the issue is not necessary to the outcome of this appeal, it is appropriate to vacate the District Court's order determining that the statute is unconstitutional. *See Baxter*, ¶ 51. Further, we decline to address the other arguments raised by the parties pertaining to the children's therapy records.

¶51 We affirm the District Court's Findings of Fact and Conclusions of Law and Order regarding the Final Parenting Plan. We vacate the District Court's Opinion and Order declaring § 40-4-225, MCA, unconstitutional.


/S/ JIM RICE


We concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER

20